Filed 2/26/14  P. v. Patlan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JERRY EDDIE PATLAN,<br><br>    Defendant and Appellant. | H038200<br>(Santa Clara County<br>Super. Ct. No. C1081130) |

Defendant Jerry Eddie Patlan appeals his convictions for possession for sale of methamphetamine (Health & Saf. Code, § 11378) and transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)) arising out of a traffic stop. Due to prior strike convictions, the Superior Court sentenced defendant to 25 years to life in prison pursuant to former Penal Code section 667.[1]  On appeal, defendant contends: (1) the trial court erred by failing to provide a pinpoint jury instruction proffered by defendant; (2) the People engaged in two instances of prosecutorial misconduct; (3) one of his prior strike convictions was not proven beyond a reasonable doubt; and (4) he is entitled to "automatic, non-discretionary" resentencing due to Proposition 36, the Three Strikes Reform Act of 2012 (the Act), which California's electors approved in November 2012.  For the reasons stated here, we will affirm the judgment.

---

[1]  Unspecified statutory references are to the Penal Code.  As discussed in part II.D., *post,* in November 2012 California's voters passed Proposition 36, which made substantial changes to section 667.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of June 28, 2010, San Jose Police Officer Jenni Byrd was on patrol in a marked police car when she saw a black truck (later identified as a Toyota 4Runner) fail to stop completely at a stop sign.  Officer Byrd followed the vehicle around a corner and activated her emergency lights to effect a traffic stop as the 4Runner turned into a driveway.  After stopping her patrol car and partially blocking the driveway, Officer Byrd began to exit her patrol car and noticed the driver (later identified as defendant) of the 4Runner crouch down with his head and right shoulder in a movement consistent with reaching for something with his right arm.  Almost simultaneously, the passenger, Robert Contreras, exited the 4Runner with a backpack in one hand and began walking away from the vehicle.  As Contreras exited the vehicle, Officer Byrd noticed a small blue object fall from the open passenger door onto the driveway.[2]  Officer Byrd ordered Contreras back into the vehicle and Contreras complied.

When Officer Byrd went to the driver's side window, she noticed defendant had a workbag on his lap that contained multiple pairs of blue latex gloves.  There was also a single blue latex glove in the center console.  Officer Byrd placed both men in handcuffs and then moved defendant to another officer's patrol car and Contreras to the curb.

Officer Byrd then investigated the blue object, which had fallen "within the swing" of the passenger door.  The object turned out to be a blue latex glove, similar to those found in the workbag and on the center console.  It was missing the middle finger[3] and contained eight baggies and one bindle.[4]  The containers held an off-white crystalline substance that was later identified as over 15 grams of methamphetamine.

_____

[2]  During trial, Officer Byrd testified both that the blue object "fell" and that it followed a "directional angle" consistent with it being thrown.

[3]  Officer Byrd eventually found the glove's middle finger in a metal box underneath the front passenger seat.

[4]  Officer Byrd testified a bindle is a larger plastic bag that can be tied off to hold drugs.

Officer Byrd interviewed both occupants separately shortly after the traffic stop and provided *Miranda*[5] warnings to each of them. Though she had not actually seen whether either occupant discarded the blue object, she informed both of them that she saw Contreras discard the drugs. Officer Byrd testified at trial that this lie was part of an investigative technique to attempt to gain an admission from defendant that he was responsible for the methamphetamine. After learning that defendant and Contreras were cousins, she theorized that defendant would accept responsibility for the drugs rather than seeing his cousin get in trouble. Neither defendant nor Contreras accepted responsibility.

During the traffic stop and interviews, Officer Byrd determined that defendant appeared to be under the influence of methamphetamine but that Contreras did not. Defendant also admitted to another officer that he had "done a line earlier" that day, which Officer Byrd understood as meaning he had used methamphetamine. Based on defendant's appearance, his admission of drug use, and the presence of blue gloves in defendant's workbag that matched the glove containing the methamphetamine, Officer Byrd arrested defendant. He was later charged with possession for sale of methamphetamine (Health & Saf. Code, § 11378) and transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)).

Defendant's first trial resulted in a mistrial. At defendant's second trial, the People presented DNA evidence obtained from samples taken from the baggies and bindle that determined defendant was a likely contributor to the DNA on the baggies. This evidence had not been presented at the first trial. At both trials, defendant's theory was that the methamphetamine in the vehicle belonged to Contreras, not defendant.

At the close of evidence in the second trial, defendant requested a pinpoint jury instruction regarding the legal definition of "control" for purposes of possession for sale of a controlled substance. After a hearing on the issue, the court found CALCRIM No.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

2302 adequately defined the term "control."  The second jury convicted defendant of both possession for sale and transportation of methamphetamine.  After the jury was discharged, the bifurcated issue of defendant's prior convictions was tried to the court, which found the existence of two prior strikes.  The court denied defendant's *Romero*[6] motion, and sentenced defendant to 25 years to life in prison.  Defendant timely appealed.

## II.  DISCUSSION

### A.  JURY INSTRUCTIONS

Defendant claims that by refusing to give his requested pinpoint instruction, the trial court failed to define an element of possession of a controlled substance for sale and failed to instruct the jury on a defense theory.  The trial court included CALCRIM No. 2302 in the instructions read to the jury.  This instruction lays out the following elements for possession for sale of methamphetamine: (1) possession of a controlled substance by defendant; (2) defendant's knowledge of the presence of a controlled substance; (3) defendant's knowledge that the substance was in fact a controlled substance; (4) defendant's intent to sell the substance; (5) the controlled substance was methamphetamine; and (6) the controlled substance was in a usable amount.  (CALCRIM No. 2302.)  Regarding possession and control, the court included bracketed language from the form instruction, stating: "A person does not have to actually hold or touch something to possess it.  It is enough if the person has control over it or the right to control it, either personally or through another person."

In addition to this form instruction, defendant requested that the court provide a pinpoint instruction paraphrased from the language of *People v. Redrick* (1961) 55 Cal.2d 282, 285.  The proposed instruction stated, in relevant part, "the defendant cannot be convicted of unlawful possession merely because he had an opportunity to access a place where controlled substances were found."  Defendant's counsel claimed the pinpoint

_____

[6]  *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

instruction was necessary to differentiate between mere access to the methamphetamine in a car driven by defendant and the control necessary to constitute a violation of Health and Safety Code section 11378. The trial court denied defendant's request, finding CALCRIM No. 2302 adequately and accurately described the crime of possession of methamphetamine for sale.

We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Jury instructions are adequate if they " 'fully and fairly instructed [the jury] on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) Adequacy must be determined by considering all instructions provided to the jury and assuming jurors are " 'capable of understanding and correlating all jury instructions which are given.' [Citations.]" (*Ibid.*) Finally, we must interpret instructions to support the judgment " 'if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*)

### 1. The Instructions Adequately Defined All Elements of Possession of Methamphetamine For Sale

Defendant claims the version of CALCRIM No. 2302 provided to the jury was inadequate because a juror could have incorrectly concluded defendant could be convicted based on his mere proximity and access to the methamphetamine in the vehicle. An identical claim was considered and rejected in *People v. Montero* (2007) 155 Cal.App.4th 1170 (*Montero*). In *Montero*, after finding a baggie containing methamphetamine during a parole search of the defendant, officers searched the garage where Montero had been standing and discovered three additional baggies containing methamphetamine that matched the first baggie recovered from the defendant. (*Id.* at pp. 1173-1174.) On appeal from his conviction for possession for sale, the defendant claimed that CALCRIM No. 2302 erroneously omitted the elements of " 'dominion and control' " from the definition of possession for sale. (*Montero, supra*, at p. 1174.)

In rejecting the defendant's claim, the court noted that the instruction "requires the defendant to have control over the substance." (*Montero, supra*, 155 Cal.App.4th at p. 1180.)  Because of this control requirement, the court concluded "the jury could not find defendant guilty simply due to his proximity to the substance" and that "[n]o reasonable juror would have believed that proximity alone equaled control."  (*Ibid.*)

We agree with *Montero's* reasoning and find defendant's argument unpersuasive. The relevant language of CALCRIM No. 2302 states that a defendant possesses a controlled substance if he or she "has control over it or the right to control it . . . ." (CALCRIM No. 2302.)  From this, a reasonable juror would understand that possession involves control over the substance and would not encompass merely having control over the vehicle in which the substance was located.  To hold otherwise would assume jurors are incapable of understanding instructions provided in plain English, which is something we cannot do.  (See *Ramos, supra,* 163 Cal.App.4th at p. 1088.)  If anything, the requested instruction would have been duplicative of CALCRIM No. 2302.  Courts may refuse to give instructions that are duplicative of other instructions.  (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.)

## 2.  The Instructions Informed the Jury of the Defense Theory

We also find defendant's "theory of the case" claim to be without merit. Defendant's theory was that Contreras, not defendant, possessed the methamphetamine. Defendant's proposed instruction sought to further clarify the elements of Health and Safety Code section 11378 by informing the jury that mere access to a controlled substance does not prove possession for sale.  However, as discussed in greater detail above, CALCRIM No. 2302 explains that possession requires more than mere proximity by stating the defendant must have "control over it or the right to control it . . . ." (CALCRIM No. 2302; see *Montero, supra,* 155 Cal.App.4th at p. 1180.)

While a specific additional instruction might have been warranted if defendant had raised a complex theory regarding his innocence, his theory - essentially, "the other guy did it" - is a commonly encountered defense. The definition of possession in CALCRIM No. 2302, coupled with defense counsel's closing argument, which focused on evidence supporting defendant's theory that Contreras possessed the methamphetamine, provided adequate information to the jury regarding defendant's theory of the case.

## B.     PROSECUTORIAL MISCONDUCT

Prosecutors are held to a higher standard than other attorneys because they "exercise[] the sovereign powers of the state." (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1076.) For this reason, prosecutors must take special care to avoid " 'rude or intemperate behavior' . . . . [Citation.]" (*Ibid.*) Prosecutorial misconduct implicates both federal and California Constitutional due process rights. The Fifth Amendment right to due process, applicable to California via the Fourteenth Amendment, is violated when a prosecutor's conduct is "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Harris* (1989) 47 Cal.3d 1047, 1084; *People v. Ochoa* (1998) 19 Cal.4th 353, 427.) Prosecutorial misconduct occurs under state law if the prosecutor uses "deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Strickland* (1974) 11 Cal.3d 946, 955; *Ochoa, supra,* 19 Cal.4th at p. 427.)

### 1.  The People's Argument Regarding the Role of Attorneys

During her closing argument, the prosecutor made the following statements: "It is my job as a district attorney to prove to you the case beyond a reasonable doubt. It is my job to present to you facts, facts that lead you to an abiding conviction to [*sic*] the truth of the charge. [¶] The defense's role is very different. The defense's role is to cause you to doubt the truth." Defense counsel objected to the foregoing statement as improper

argument, which the court sustained.  The court did not immediately provide the jury admonition requested by defense counsel.

When the prosecutor continued the same line of argument by stating "they have built the case around . . .  what the defense believes that the evidence actually is," defense counsel objected again and the court, after holding a sidebar, provided the following admonition to the jury: "Ladies and gentlemen of the jury, I want to remind you that it is your role as jurors to serve as independent judges of the facts, all right. That is, you are to determine from the evidence presented in this court and the evidence alone what facts have been proven, and you will ultimately, from those facts, determine whether or not the People have met their burden of proving the defendant's guilt beyond a reasonable doubt. [¶] You are not to be sidetracked, confused or in any way to deviate from that role by your attempts to or in any attempt to evaluate how you feel either party may have done their job as an attorney in this trial, all right.  Your only job is to deal with evidence and what it does or does not prove."

On appeal, defendant claims the prosecutor's remarks constitute misconduct requiring reversal of defendant's conviction because they improperly disparaged defense counsel.  "Personal attacks on the integrity of opposing counsel constitute prosecutorial misconduct." (*Herring, supra,* 20 Cal.App.4th at p. 1076.)  Defendant claims the prosecutor's conduct in this case is "almost identical" to the prosecutor's conduct in *Herring* and encourages us to follow that opinion and reverse defendant's conviction. We disagree.

In *Herring*, the prosecutor stated during the closing argument: " 'My people are victims.  His people are rapists, murderers, robbers, child molesters.  . . .  He does not want you to hear the truth.' " (*Herring, supra,* 20 Cal.App.4th at p. 1073.)  Based on these statements, as well as others targeting the defendant using racially insensitive language, the *Herring* court reversed the defendant's conviction, holding that "[i]t is

improper for the prosecutor to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character." (*Id.* at p. 1075.)

Unlike the prosecutor's statements in *Herring*, here the prosecutor's main improper statement was that the role of defense counsel "is to cause you to doubt the truth." Her statement, while incorrect and improper, is far from "identical" to those made in *Herring* and did not make the trial so fundamentally unfair as to require reversal. Further, the trial court here mitigated any damage by admonishing the jury soon after the prosecutor's statement to "serve as independent judges of the facts" and not "attempt to evaluate how you feel either party may have done their job as an attorney . . . ." For these reasons, we find the prosecutor's improper statement did not rise to the level of misconduct requiring reversal.

### 2. The People's Bolstering of Officer Byrd

Defendant's closing argument attacked Officer Byrd's testimony by highlighting her inconsistent testimony regarding who threw the blue object as well as her demeanor throughout her testimony. Specifically, the defense focused on Officer Byrd's testimony at trial regarding the interview with defendant immediately after the traffic stop, where she told defendant she had seen Contreras, not defendant, throw the blue object. This testimony reflected only what Officer Byrd stated during the interview and did not address defendant's responses to Officer Byrd's questions.

During the People's rebuttal to defendant's closing argument, the prosecutor stated: "And perhaps Officer Byrd was a little naive to think that she could appeal to the defendant's sense of family when she took the strategy, the interrogation strategy that she did. It clearly did not work. But that's what she was trying to do. She was trying to say to Mr. Patlan, your cousin's going to go down for this. She knew Mr. Contreras did not possess those drugs. She was hoping, naively, that he would step up and not let his cousin take the fall." The trial court overruled defendant's objection that the prosecutor

was commenting on defendant's post-*Miranda* silence in violation of the United States Supreme Court opinions of *Griffin* and *Doyle*.[7]

Focusing on the prosecutor's statement that Officer Byrd's tactic of attempting to elicit a confession from defendant by claiming she saw Contreras throw the methamphetamine "did not work," defendant argues the prosecution impermissibly relied on defendant's post-*Miranda* silence and the trial court erred in overruling his objection. Assuming defendant actually invoked his right to remain silent, his argument is without merit because, if anything, his silence raised an inference of innocence rather than guilt.

Implicit in the Fifth Amendment's right against self-incrimination as well as the rationale behind *Miranda* warnings is an understanding "that exercise of the right of silence will not be penalized." (*People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1520.) *Eshelman* illustrates this concept. There, during both cross examination of the defendant and the prosecutor's closing argument, the prosecutor focused on the defendant's refusal to answer questions the murder victim's mother had previously asked the defendant. (*Id.* at p. 1519.) During the closing argument, the prosecutor went so far as to ask the jury "What was [the defendant] trying to hide?" (*Ibid.*) The appellate court reversed the defendant's conviction, holding "the improper purpose of the prosecutor's questions was to utilize appellant's silence to impeach his defense and thereby to solemnize the silence into evidence of guilt." (*Id.* at p. 1521.)

Unlike the prosecutor's statements in *Eshelman*, which focused on defendant's conduct, here the prosecutor discussed Officer Byrd's interview strategy in order to rehabilitate the officer. The prosecutor's rebuttal came in response to attacks on Officer Byrd's credibility during the defense's closing argument. Moreover, as stated above, to the extent the prosecutor's statements discussed defendant's post-*Miranda* silence, that silence creates no inference of guilt. Officer Byrd's statements implicated Contreras, not

---

[7] *Griffin v. California* (1965) 380 U.S. 609; *Doyle v. Ohio* (1976) 426 U.S. 610.

defendant, as the person responsible for the methamphetamine. Because the prosecutor did not rely on post-*Miranda* silence to defendant's detriment, we find no prosecutorial misconduct.

### 3. Ineffective Assistance of Counsel

Defendant claims his trial counsel erred by failing to object to the prosecutor's statements in closing and rebuttal arguments because they assumed facts not in evidence. To prevail, defendant must show his trial counsel's performance was deficient and that the deficiency prejudiced defendant. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To prove prejudice, defendant must affirmatively show a reasonable probability that, but for his trial counsel's errors, the result would have been different. (*Id.* at pp. 217-218.) A reasonable probability is one " 'sufficient to undermine confidence in the outcome.' " (*Id.* at p. 218, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 693-694.) Finally, "[i]f a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150, citing *Strickland, supra,* at p. 697.)

Defendant argues the prosecutor's statement that the defense's role was to make the jury "doubt the truth" assumed facts not in evidence because it suggested that the prosecutor knew what "the truth" was. Even assuming counsel was deficient for not objecting on that basis, defendant can show no prejudice because, as discussed above, the trial court sustained counsel's objection as it was presented and admonished the jury to be "independent judges of the facts . . . ." In essence, the court's admonition, which it related to the jurors soon after the objectionable statement, reminded them that they were responsible for determining "the truth." As such, defendant suffered no prejudice from this omission. (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375 ["a timely admonition from the court generally cures any harm"].)

Defendant also claims defense counsel was deficient for failing to object to the prosecutor's reference to facts not in evidence to bolster Officer Byrd's credibility. Defense counsel spent the majority of his closing argument assailing Officer Byrd's credibility by pointing out inconsistencies in her statements at various points during the investigation and the two trials. In particular, defendant argued Officer Byrd's testimony could not be trusted because she initially told both defendant and Contreras that she saw Contreras throw the methamphetamine-filled glove out of the vehicle but later testified that she did not actually see who discarded the glove.

The prosecutor's rebuttal argument attempted to rehabilitate the officer's credibility. The prosecutor referred to Officer Byrd's testimony that the inconsistent statements were part of a tactical lie designed to elicit a confession from defendant. Had the prosecutor developed this explanation herself, argument on that point would constitute improper vouching. However, because the prosecutor was merely relating an explanation offered by Officer Byrd in her testimony, the prosecution's conduct involved permissible "argument from facts in the record directed to the credibility of witnesses . . . ." (*People v. Sully* (1991) 53 Cal.3d 1195, 1235-1236 [rejecting claim of improper vouching when prosecutor relied on facts in the record to bolster witness credibility].) A prosecutor may not refer to evidence outside the record to vouch for the credibility of witnesses or bolster the veracity of witnesses' testimony. (*People v. Cook* (2006) 39 Cal.4th 566, 593.) But this prohibition is not implicated where, as here, the prosecutor relies on evidence in the record.

Because we find no error, defendant's cumulative error claim fails by necessity.

## C.    PRIOR STRIKE FINDINGS

Defendant claims the prosecution did not provide sufficient evidence to prove the existence of two prior qualifying convictions beyond a reasonable doubt.

Section 667 governs sentence enhancements for habitual criminals. As in effect in 2012 when the trial court sentenced defendant, section 667, subdivision (e)(2)(A) provided for "an indefinite term of life imprisonment" for defendants with "two or more prior felony convictions as defined in subdivision (d) that have been pled and proved . . . ." (Former § 667, subd. (e)(2)(A), Stats. 1994, ch. 12, § 1.) Section 667, subdivision (d) provides that prior felony convictions included "[a]ny offense defined in subdivision (c) of section 667.5 as a violent felony or any offense defined in subdivision (c) of section 1192.7 as a serious felony in this state." (§ 667, subd. (d)(1).) These prior felony convictions are commonly referred to as "strikes."

To prove prior strikes, "[t]he People must prove each element of an alleged sentence enhancement beyond reasonable doubt." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1065 (*Delgado*).) While this can often be accomplished by reference to the statute upon which the defendant's prior conviction is based, where it is unclear from a specified statute whether the conviction was for a serious or violent felony, "otherwise admissible evidence from the entire record of the conviction may be examined to resolve the issue." (*Ibid.*) Such evidence can include "certified documents from the record of the prior court proceeding . . . including the abstract of judgment describing the prior offense." (*Id.* at p. 1066.)

Certified documents create a presumption of conviction that can only be overcome by evidence calling into question " 'the authenticity, accuracy, or sufficiency of the prior conviction records . . . .' [Citation.]" (*Delgado, supra,* 43 Cal.4th at p. 1066.) "[I]f the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense." (*Ibid.*) Once a trial court has found the existence of a prior strike conviction, however, on appeal "we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence." (*Id.* at p. 1067.)

While defendant concedes the existence of one strike, he argues the record does not adequately establish his 1982 conviction under section 245, subdivision (a)[8] was a strike. During the sentencing phase of defendant's current possession for sale case, the prosecution introduced an abstract of judgment from 1982 (Santa Clara County Super. Ct. Case No. 82018) (1982 Felony) indicating defendant pleaded guilty to "PC 245(a) Assault with a Deadly Weapon." The criminal complaint from the 1982 Felony was also entered into evidence. Count two of that complaint charged defendant with violating section 245, subdivision (a) by committing "an assault upon the person . . . with a deadly weapon or instrument, to wit: a TIRE IRON, and by means of force likely to produce great bodily injury." Defendant claims the inconsistency between the complaint and abstract made it impossible to determine whether defendant's prior conviction was for assault with a deadly weapon - a serious felony pursuant to section 1192.7, subdivision (c)(31) - or merely assault by means of force likely to produce great bodily injury, which is not serious or violent for purposes of section 667. (See *Delgado, supra,* 43 Cal.4th at p. 1065 ["assault merely by *means likely to produce* [great bodily injury], without the additional element of personal infliction, is not included in the list of serious felonies"].)

In support, defendant relies on *Delgado*, where the Supreme Court considered a prior conviction for a violation of a version of section 245 similar to that in effect in 1982. (*Delgado, supra,* 43 Cal.4th at p. 1065.) To determine whether substantial evidence supported the prior strike finding, the court turned to the official abstract of judgment for the defendant's section 245, subdivision (a) prior felony. That official abstract "first identifie[d] the statute under which the conviction occurred as 'PC' '245(A)(1),' then separately describe[d] the offense as 'Asslt w DWpn.' " (*Delgado, supra,* at p. 1069.) The court rejected the defendant's assertion that the foregoing

---

[8] In 1982, section 245, subdivision (a) prohibited "assault upon the person of another with a deadly weapon or instrument or by any means of force likely to produce great bodily injury . . . ." (Former § 245, subd. (a).)

description was ambiguous and concluded it "tracks one, but only one, of the two specific, discrete, disjunctive, and easily encapsulated forms of aggravated assault . . . ." (*Ibid.*)

Like the abstract in *Delgado*, the abstract for defendant's 1982 conviction unambiguously states the conviction was for "Assault with a Deadly Weapon." Applying *Delgado*, the abstract provides substantial evidence to support the trial court's finding that defendant's 1982 conviction was a qualifying strike. Defendant attempts to overcome this result by pointing to the alleged inconsistency between the abstract of judgment and the complaint, which charged defendant with both assault with a deadly weapon and assault by means of force likely to produce great bodily injury. Defendant relies on a line of cases where ambiguities in abstracts of judgment led courts to overturn prior strike findings. (See, e.g., *People v. Rodriguez* (1998) 17 Cal.4th 253, 261-262 [overturning prior strike finding when abstract of judgment ambiguously listed § 245 violation as "ASLT GBI/DLY WPN"].) Here, however, because the abstract is unambiguous, we find these authorities inapposite.

We also find defendant's more general inconsistency argument unavailing. The complaint and abstract arose at different junctures in the case. The 1982 Felony complaint charged defendant with assault with a deadly weapon *and* assault by means of force likely to produce great bodily injury, which may be viewed as alternative bases for the charged offense. But the abstract of judgment unambiguously identified the single type of assault for which defendant was convicted and no evidence calls into question its " 'authenticity, accuracy, or sufficiency.' " (*Delgado, supra,* 43 Cal.4th at p. 1066, quoting *People v. Epps* (2001) 25 Cal.4th 19, 27.) The trial court's strike finding is therefore supported by substantial evidence.

**D.    THE THREE STRIKES REFORM ACT**

In April 2012, the trial court sentenced defendant to an indeterminate term of 25 years to life in prison pursuant to section 667 after finding the existence of two prior serious or violent felony convictions.  In November 2012, California's electors passed the Three Strikes Reform Act, which, as described in greater detail below, generally requires three serious or violent felonies to trigger an indeterminate sentence of 25 years to life.  Defendant claims we should apply the Act retroactively and remand this matter to the trial court for "automatic, non-discretionary" resentencing.  To decide this issue, we review the Act and published opinions from other districts.

**1.  New Proposition 36**

As approved by the voters in 2012, the Act amended sections 667, 1170.12, and 1170.125, and added section 1170.126.  Section 1 of the Act, containing "Findings and Declarations," states the purpose of the Act is to "restore the original intent of California's Three Strikes law-imposing life sentences for dangerous criminals like rapists, murderers, and child molesters."  (49 West's Ann. Pen. Code (2013 supp.) Historical and Statutory Notes, foll. § 667, p. 35.)  Section 1 continues that the Act will retain life sentences for serious or violent crimes but will "[s]ave hundreds of millions of taxpayer dollars every year" by resentencing non-serious, non-violent offenders to shorter terms.  (*Id.* at p. 36.)  The shift in focus to serious and violent offenders will "[p]revent the early release of dangerous criminals who are currently being released early because jails and prisons are overcrowded with low-risk, non-violent inmates serving life sentences for petty crimes."  (*Ibid.*)  Finally, section 7 of the Act calls for liberal construction to protect the "health, safety, and welfare of the people of the State of California."  (*Ibid.*)

As amended, defendants with two prior serious or violent felony convictions[9] who are convicted of a third felony that is non-serious and non-violent no longer automatically face an indeterminate term of 25 years to life in prison.  (§ 667, subd. (e)(2)(C).)  Instead, these offenders must serve "twice the term otherwise provided as punishment for the current felony conviction."  (§ 667, subds. (e)(1), (e)(2)(C) [noting non-serious, non-violent offenders "shall be sentenced pursuant to paragraph (1) of subdivision (e)"].)  Even if the current felony is not statutorily serious or violent, however, a defendant must still serve an indeterminate term of 25 years to life if any of the following is true: (1) the current felony is an enhanced "controlled substance charge"; (2) the current felony is a sex offense or requires registering as a sex offender; (3) the current felony was completed while armed with a firearm or with intent to cause great bodily injury; or (4) any of defendant's prior felony convictions is for a crime listed in section 667, subdivision (e)(2)(C)(iv).  (§ 667, subds. (e)(2)(C)(i) - (e)(2)(C)(iv).)

To further the objective of prioritizing prison space for high-risk felons, the Act also added section 1170.126.  That section states the Act applies "exclusively to persons presently serving an indeterminate term of imprisonment" as third strike offenders.  (§ 1170.126, subd. (a).)  It allows felons whose third strike was not serious or violent to petition the Superior Court for resentencing.  (§ 1170.126, subd. (b).)  Resentencing is only available to felons who, by virtue of meeting the criteria laid out in the preceding paragraph, would be eligible for sentencing as a second strike offender under amended sections 667 and 1170.12.  (§ 1170.126, subd. (e).)

Importantly, a trial court has discretion to deny resentencing to a felon who otherwise meets the resentencing criteria if the court finds resentencing "would pose an unreasonable risk of danger to public safety."  (§ 1170.126, subd. (f).)  In making that

---

[9]  Serious or violent felonies for purposes of the Act consist of the crimes contained in section 1192.7, subdivision (c), and section 667.5, subdivision (c), respectively.  (§ 667, subd. (e)(2)(C).)

determination, the court may consider any relevant evidence, including a felon's criminal conviction history and disciplinary record during incarceration.  (§ 1170.126, subd. (g).)  Finally, felons must petition for resentencing within two years of November 2012 "or at a later date upon a showing of good cause . . . ."  (§ 1170.126, subd. (b).)

### 2.  Appellate Opinions Interpreting the Act

The first published appellate opinion to address whether felons with non-final judgments[10] are entitled to automatic resentencing was *People v. Yearwood* (2013) 213 Cal.App.4th 161, 168 (*Yearwood*).  The main argument in that case was that the Act should be applied retroactively because of the Supreme Court's opinion in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).  In *Estrada*, the Supreme Court held that when a statutory amendment mitigates punishment and there is no saving clause,[11] the amendment will apply retroactively to all defendants whose judgments are not yet final.  (*Id.* at p. 748.)  This holding is an exception to the general rule found in section 3 that all sections of the Penal Code are to be prospectively applied.  (*Id.* at p. 746.)

In *Yearwood*, the Fifth Appellate District determined that *Estrada* was inapplicable, concluding that the new sentencing regime does not apply retroactively to felons with non-final judgments.  (*Yearwood, supra,* 213 Cal.App.4th at pp. 168, 172.)  The court conceded that the Act contains neither a saving clause nor any reference to retroactivity.  (*Id.* at p. 172.)  Nonetheless, it found the sentence recall petition process added as section 1170.126 acted as a "functional equivalent" of a saving clause.  (*Ibid.*)  The court supported its conclusion that section 1170.126 operates as a saving clause by

---

[10]  A judgment is not final for purposes of the retroactive effect of statutes " 'so long as the courts may provide a remedy on direct review[, which] includes the time within which to petition to the United States Supreme Court for writ of certiorari.' " (*Yearwood, supra,* 213 Cal.App.4th at p. 171, quoting *In re Pine* (1977) 66 Cal.App.3d 593, 594.)

[11]  We refer to "saving clause" here as an express statutory provision calling for prospective application.

referring to the goals of the Act. Specifically, it found the overarching goal of public safety showed the voters intended the sentence recall petition process to be the sole remedy and that holding otherwise would take away the discretion of the trial courts to ensure that unreasonably dangerous felons remain in prison for 25 years to life. (*Id.* at p. 176.)

Yearwood also addressed the claim that section 1170.126, subdivision (b) is ambiguous because it does not specify whether it is applicable to all currently incarcerated felons or only those whose sentences are final. The court rejected that contention, finding no ambiguity. (*Yearwood, supra,* at p. 177.) The court reasoned that the Act's failure to distinguish between final and non-final judgments meant that Section 1170.126 applies to all "persons presently serving an indeterminate term of imprisonment . . . ." (§ 1170.126, subd. (a); *Yearwood, supra,* at p. 177.)

The defendant in *Yearwood* also claimed section 1170.126, subdivision (k) supported retroactivity by its statement that "[n]othing in this section is intended to diminish or abrogate any rights or remedies otherwise available to the defendant." (§ 1170.126, subd. (k).) The court disagreed, interpreting that subdivision to preserve only the ability of felons to challenge their convictions by direct appeal or collateral attack. (*Yearwood, supra,* at p. 178.) Finally, the court rejected the defendant's equal protection argument, finding that the discretion given to trial court judges by section 1170.126 was rationally related to the legitimate state interest of "increas[ing] the likelihood that prisoners whose sentences are reduced or who are released due to the Act will not pose an unreasonable risk of danger to the public." (*Yearwood, supra,* at p. 179.) The Supreme Court denied review of *Yearwood* in May 2013. (*People v. Yearwood* (May 1, 2013, S209069).)

Since *Yearwood*, other districts have published conflicting opinions regarding the retroactive application of the Act and the California Supreme Court has granted review in each of the following: *People v. Conley* (2013) 215 Cal.App.4th 1482, review granted

Aug. 14, 2013, No. S211275, 304 P.3d 1070 [3d Dist., no retroactivity]; *People v. Lewis* (2013) 216 Cal.App.4th 468, review granted Aug. 14, 2013, No. S211494, 304 P.3d 1071 [4th Dist., Div. 2, retroactive]; *People v. Lester* (2013) 220 Cal.App.4th 291, review granted Jan. 15, 2014, No. S214648, 315 P.3d 1182 [4th Dist., Div. 2, no retroactivity]; *People v. Contreras* (2013) 221 Cal.App.4th 558, review granted Jan. 29, 2014, S215516, __ P.3d __ [4th Dist., Div. 3, retroactive].

### 3. Analysis

Section 3 provides the general rule that Penal Code provisions are not retroactive, "unless expressly so declared." (§ 3.) In *Estrada*, the Supreme Court announced an exception to this general rule, holding that statutes that mitigate punishment are to be applied retroactively to all non-final judgments. (*Estrada, supra,* 63 Cal.2d at p. 748.) Courts have, however, recognized two situations where statutes that ameliorate punishment will not apply retroactively: (1) when the statute contains a saving clause (*Ibid*.); and (2) when the Legislature demonstrates an intent to apply a statute prospectively "with sufficient clarity that a reviewing court can discern and effectuate [the intent]" (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1049, see also *People v. Nasalga* (1996) 12 Cal.4th 784, 793).

Both parties concede the Three Strikes Reform Act contains no explicit saving clause. Section 10 of the Act, which contains its effective date, merely states it is "effective on the first day after enactment . . . ." (49 West's Ann. Pen. Code (2013 supp.) Historical and Statutory Notes, foll. § 667, p. 36.) Because there is no explicit saving clause, we must determine whether there is clear voter intent to depart from the *Estrada* rule and apply the statute only prospectively.

We interpret initiatives the same as statutes. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900-901.) We look first to the statutory text and attempt to give words their plain meaning. (*Id.* at p. 901.) We construe language in the context of the "statute

as a whole and the overall statutory scheme . . . ." (*People v. Rizo* (2000) 22 Cal.4th 681, 685.) If a statute is ambiguous, we seek to effectuate the intent of the voters by reviewing relevant legislative history, including the analyses and arguments contained in the official ballot pamphlet. (*People v. Birkett* (1999) 21 Cal.4th 226, 243.)

Section 7 of the Act calls for liberal construction to protect the "health, safety, and welfare of the people of the State of California." (49 West's Ann. Pen. Code (2013 supp.) Historical and Statutory Notes, foll. § 667, p. 36.) Penal Code section 1170.126 states the sentence recall petition process applies exclusively to "persons presently serving an indeterminate term of imprisonment" as third strike offenders. (§ 1170.126, subd. (a).) Defendant claims section 1170.126, subdivision (a) is ambiguous because it fails to specify whether it applies to all persons serving indeterminate terms or only those whose judgments are already final. We disagree because the plain language of the section suggests it applies to *all* persons, without regard to finality of judgment.

Even if we were to conclude the section is ambiguous, consideration of that language in the context of the Act as a whole supports finding the voters intended the sentence recall petition process from section 1170.126 to be the exclusive resentencing remedy for individuals in defendant's position. Our interpretation of the Act serves its purpose of protecting the public's health, safety, and welfare by ensuring trial court judges tasked with resentencing offenders retain the discretionary authority to deny petitions filed by individuals who would pose an unreasonable risk of danger to public safety. (§ 1170.126, subds. (f), (g).) The official summary, arguments, and legislative analysis of the Act likewise make no mention of a distinction between final and non-final judgments. They merely note that some individuals currently serving indeterminate terms for a non-serious, non-violent third strike could be resentenced, but only if a "judge determines [offender] does not pose unreasonable risk to public safety." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) summary of the Act prepared by the Attorney General, p. 48.) The only references to the concept of resentencing track the

sentence recall petition process set forth in section 1170.126. (E.g., Voter Information Guide, Gen. Elec. (Nov. 6, 2012) analysis of the Act by the Legislative Analyst, p. 50 ["This measure allows certain third strikers to apply to be resentenced" unless the trial court "determines that resentencing the offenders would pose an unreasonable risk to public safety"].)

Despite the lack of an explicit saving clause, we conclude the plain language of section 1170.126 read in the context of the statute as a whole provides clear intent to apply the Act prospectively. As such, we conclude defendant is not entitled to automatic resentencing but can avail himself of the sentence recall petition process if he meets the statutory prerequisites.

### III. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Rushing, P.J.

_____

Márquez, J.