[No. B041764. Second Dist., Div. Six. Nov. 8, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES RICHARD ESHELMAN, Defendant and Appellant.

**COUNSEL**

John Paul Ward, under appointment by the Court of Appeal, and Eric Weaver for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Thomas L. Willhite, Jr., Alison Braun and David Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STONE (S. J.), P. J.**—Charles Richard Eshelman appeals his conviction for second degree murder, the jury also finding he personally used a firearm in the commission of the offense. (Pen. Code, §§ 187, subd. (a); 12022.5.) He was sentenced to a total fixed term of 17 years in state prison: 15 years to life for the murder conviction plus 2 years for the firearm-use enhancement.

Appellant contends that he was denied the effective assistance of counsel when his trial attorney failed to object to the prosecutor's references to his post-*Miranda (Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694, 86

S.Ct. 1602, 10 A.L.R.3d 974]) silence in violation of *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], and also that his sentence constitutes cruel and unusual punishment.

We affirm the judgment.

*Facts*

The evidence is viewed in the light most favorable to the People. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

In May 1987, appellant moved in with Susan Hyde (Susan) who lived in a trailer at the Carpinteria Camper Park. She had two grown children, Robin and the victim Rick. Appellant had a wife who lived in his home in Goleta.

During June and July 1988, Robin stayed with Susan and appellant in the trailer. Rick was living in a shed behind the trailer. Towards the end of June, Susan got into an argument with Robin and Robin attempted to break a glass bottle with the apparent intent of attacking her mother with it. When Rick entered the trailer to break up the fight and yelled at them to stop, appellant picked up a baseball bat. According to Susan, the men did not confront or threaten each other. Appellant's version was that he shoved Rick toward the door after Rick threatened to kill Susan and Robin, and from then on ceased to be on speaking terms with him.

Susan called the police about the incident. They suggested that she get a restraining order against her children. Although she testified that Rick never threatened her, Susan obtained a restraining order only against him.

When she decided that she did not want Rick to live in the shed anymore, Susan called the police to evict him. The police assisted her in working out a compromise whereby Rick could leave his belongings in the shed but not sleep there. Soon thereafter, Rick returned to Susan's trailer and threw a rock through one of the trailer's windows. Susan had no further similar problems with Rick prior to his death.

Appellant photographed the rock and the broken window and became obsessed about the incident. He would go on and on about it and complain that Rick was not held accountable. Appellant kept a handgun in the trailer and he and Susan had arguments over it because she did not want it around.

The evening before the murder, appellant got upset when he heard Rick outside the trailer and took his gun out. That night he went to bed wearing the gun.

The next morning, Susan asked appellant to leave her trailer for a few days. Appellant would not stop talking about the rock Rick threw and even asked Susan to show the police how big it was. Later in the day, appellant called Susan from his house in Goleta and was still going on about the rock Rick had thrown. Susan told him to calm down and affirmed that she wanted him to stay away.

About 5:30 p.m. that day, appellant returned to Susan's trailer on the pretext of bringing her back some laundry. He and Susan had an argument and she told him to leave. As appellant was putting his belongings into a box, Susan saw Rick walk by the trailer and told appellant to leave right then, knowing the problems appellant was having with him.

Susan then went outside and told Rick he could no longer keep his belongings in the shed. He argued that the police said he could keep them there. Susan told Rick that she had a restraining order; he demanded to see it. She went back to the trailer to get it, and returned to show it to him, whereupon Rick tossed it over a fence. Susan went back to the trailer to call the police. Rick followed her, coming up to the closed screen door of the trailer and saying he also wanted to talk to the police.

In the meantime, although not hearing the conversation between Susan and Rick outside the trailer, appellant had gone out to his car to get his gun. He loaded it, wrapped it in a sweatshirt, and walked back to the trailer.

When Rick walked up to the closed screen door, appellant, who was then inside the trailer, walked over to the door. Susan, appellant and Rick stood still for a moment. Susan then heard the screen door click and thought Rick was going to come inside. However, he was staring at her and looking horrified. When he started to back away, appellant took a step and shot Rick in the head. Rick was less than two feet away from appellant. Susan testified that appellant shot him for no reason. Appellant admitted to the police that he shot Rick.

The police found Rick's body where it had fallen. He had not been carrying any weapons and had been holding two duffle bags in his right hand and some folded laundry in his left hand.

Susan saw appellant after he was released on bail. She attempted to find out why he killed Rick, but he would not tell her what happened. He said she would not believe him and he would tell her after the trial. Against his attorney's advice not to see Susan, appellant visited her at her trailer several times. However, he still would not talk to her about the shooting.

Appellant's defense was that the killing was accidental. Based on the rock-throwing incident, other alleged damage Rick had done to the outside of Susan's trailer, and alleged threats by Rick that he would physically harm Susan and appellant, he believed Rick was dangerous. On the other hand, appellant testified that he had never seen Rick with any weapons.

He stated that the night before the shooting, Rick walked by the trailer as appellant was sitting on the couch and said, " 'I see you in there. I'll get you, you fucker.' " The day of the shooting, after appellant had gone to his car to get his gun and returned to the trailer, Susan told him to " 'get the hell out of here before he [Rick] beats the shit out of you.' " Appellant testified that, at this, he became panic-stricken. While Susan was telephoning the police, Rick walked by the trailer door and said to appellant, " 'I'll break your other arm, you fucker.' " After appellant responded, " 'Yeah,' " Rick "whirled around and charged." Appellant fired one shot out the door, aiming for the ground. He did not intend to shoot the victim and only wanted to fire a warning shot.

## DISCUSSION

*Doyle Error*

Appellant contends that he was denied the effective assistance of counsel when his attorney failed to object to the prosecutor's cross-examination and closing argument on the subject of appellant's refusal to tell Susan why he killed Rick. Appellant claims this violated *Doyle* v. *Ohio, supra,* 426 U.S. 610.

The following took place during appellant's cross-examination: "Q Are you in love with Susan Hyde today? [¶] A I love Susan Hyde. [¶] . . . Q And you talked to her since you got released from custody on bail; isn't that true? [¶] A Yes, sir. [¶] Q And she asked you 'Why did you kill my son,' didn't she? [¶] A Yes, sir. [¶] Q And you would never tell her, would you? [¶] A No, sir. [¶] Q Why not? Why wouldn't you tell the woman you loved why you killed her son? [¶] A I wanted to very much, but . . . what I did tell her at the time was that she had to be satisfied, she had to work out in her own mind when I testified how she felt about me, that I wasn't going to give her a sales talk, and I wasn't going to—[¶] . . . Q Isn't it true, Mr. Eshelman, she asked you several times the first time you met her out at Goleta park, hasn't she said 'Why did you do this, Dick? Why did you do this to Rick,' isn't that true? [¶] A She's asked me a number of times. [¶] Q And isn't it true you said, 'Wait, and I'll tell you at trial'? [¶] A Yes, sir. [¶] Q Why is it you were so afraid to wait until today to tell her? [¶] A Well, for several reasons. I spent a lot of sleepless nights wondering if I was going to

be put back in jail for seeing her. She would initiate the meetings, and she'd call me, and I was very apprehensive I'd be put back in jail, and I just didn't want to discuss the incident with her. I didn't think at the time she could handle anything psychologically. I just wanted it to be an official format that she would know that it was the truth. [¶] . . . Q Is that because you were going to lie to her before, and now you are telling the truth? [¶] A No. No, sir. On the attorney's advice, I was told not to talk to her, but I really wanted to set her mind at ease. [¶] Q So you didn't talk about it when she asked why you killed her son, you did that on advice of counsel? [¶] A Partly it was on advice of counsel, but it was just I didn't want to discuss the incident with her because for one thing, I didn't think that she could handle . . . any of it, and I didn't think it was proper to tell her just on a personal basis. [¶] . . . Q Isn't it true that your lawyer told you also not to even talk to her if she called? [¶] A Yes, sir [¶] . . . I was walking with my daughter and my dogs at Lake Los Carneros at about 9:30 in the morning, and Susan came up to me, and she was just shattered, and I said, 'Susan, I can't talk to you. I'm under a Court order. I'm going to be put back in jail,' . . . [¶] . . . I did not ever want to initiate a phone call or a meeting with Susan because I didn't know what shape she was in, . . . so I always told her if . . . she needed me or wanted to talk to me . . . to call me, and she said she was ostracized by all the people in the trailer park, she had no friends left, and she was talking about joining Rick, and things like that, and I just couldn't desert her. [¶] Q . . . [¶] Q Given all those noble ideas, why didn't you tell her when she asked you why you killed her son? [¶] A I just did not want to discuss the incident with her."

During his closing argument, the prosecutor commented: "Why not tell Susan Hyde when she asked the questions? Defendant has admitted on the stand that he still loves Susan Hyde, that he saw her after he was released, and, of course, the question that a mother is going to have when her son is dead to the person who killed him, 'Why did you do it?' I mean, it's a natural question. 'Why'd you do it?' And the defendant wouldn't answer . . . . [A]nd then he says, 'Well, my attorney told me not to talk, and that's the reason I said that.' And also, 'Susan was in no state to hear it.' [¶] Well, let's go to the first statement. 'My attorney told me not to talk.' Well, the attorney also told him not to see Susan Hyde, to stay away. And that didn't deter him, so it's not like he has an ironclad feeling that whatever the attorney said, he had to do. [¶] But then the other statement, 'I didn't think she was able to hear it.' Well, why was she not able to hear it in October and November, but is able to hear it now here in court? What was he trying to hide?"

To require the reversal of a conviction for ineffective assistance of counsel, appellant must first show that counsel's performance was deficient

under prevailing professional norms and, second, that he was prejudiced by this performance to the extent there is a reasonable probability the fact finder would have doubted his guilt absent the errors. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].)

█ In the present case, to determine whether counsel's performance was incompetent, we must first decide if the prosecutor committed *Doyle* error. Defense counsel's performance cannot be considered deficient if there was no error to object to.

*Doyle* v. *Ohio* is founded on the notion that it is fundamentally unfair to use a defendant's post-*Miranda* silence to impeach his trial testimony in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized. (*Wainwright* v. *Greenfield* (1986) 474 U.S. 284, 291-292 [88 L.Ed.2d 623, 629-631, 106 S.Ct. 634]; *People* v. *Crandell* (1988) 46 Cal.3d 833, 878 [251 Cal.Rptr. 227, 760 P.2d 423].) Similar reasoning supports the conclusion that comments which penalize the right to counsel also are prohibited. (*People* v. *Crandell, supra.*)

*Doyle* and the majority of the cases interpreting it concern a defendant's postarrest failure to explain his conduct to the *police*. In this case, the prosecutor referred to appellant's silence only in regard to his refusal to explain his crime to a *private citizen*. Respondent contends that, since admissions or statements of a defendant to a private citizen infringe no constitutional guaranties (*People* v. *Mangiefico* (1972) 25 Cal.App.3d 1041, 1049 [102 Cal.Rptr. 449]), *Doyle* has no application here. (See *People* v. *Martin* (1980) 101 Cal.App.3d 1000, 1006-1007 [162 Cal.Rptr. 133], holding it is not error for a prosecutor to comment on defendant's silence in the face of an accusation by a private party that defendant committed the crime.) Appellant points out that *Doyle* error attaches to references by the prosecutor to defendant's post-*Miranda* failure to talk to *anyone*. (*People* v. *Galloway* (1979) 100 Cal.App.3d 551, 556-558 [160 Cal.Rptr. 914].)

Based on *Doyle*'s rationale, we think that the test in applying *Doyle* should focus on the circumstances surrounding defendant's post-*Miranda* silence. *Doyle* need not apply to defendant's silence invoked by a private party absent a showing that such conduct was an assertion of his rights to silence and counsel. (See *People* v. *Martin, supra,* 101 Cal.App.3d 1007, 1009.) On the other hand, when the evidence demonstrates that defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights, then *Doyle* should apply.

Here, appellant testified that he refused to talk to Susan about the murder for two reasons: his attorney told him not to speak to her before the trial,

and he was attempting to protect her emotionally. While the second reason is insufficient to call *Doyle* into play, plainly, the first reason exhibited appellant's reliance on his constitutional rights to silence and counsel. *Doyle* error thus occurred when the prosecutor, through his cross-examination and closing argument, challenged appellant's post-*Miranda* refusal to discuss the crime with Susan.

We disagree with the People's analysis that the prosecutor was not drawing any adverse inference from appellant's exercise of his rights, but was merely attempting to show the insincerity of appellant's feelings for Susan, i.e., if he truly cared for her, why wouldn't he tell her why he killed her son? The danger in focusing on defendant's post-*Miranda* silence is that the jury is likely to assign much more weight to defendant's previous silence than is warranted. (*People* v. *Galloway, supra*, 100 Cal.App.3d 557, citing *United States* v. *Hale* (1975) 422 U.S. 171, 180 [45 L.Ed.2d 99, 106-107, 95 S.Ct. 2133].) Here, the prosecutor not only insinuated in his closing argument that appellant's silence meant he was hiding something, his remarks about this matter are contained within his discussion about the insufficiency of appellant's defense. We believe that this indicates the improper purpose of the prosecutor's questions was to utilize appellant's silence to impeach his defense and thereby to solemnize the silence into evidence of guilt. (See *People* v. *Modesto* (1967) 66 Cal.2d 695, 713 [59 Cal.Rptr. 124, 427 P.2d 788]; *People* v. *Galloway, supra*, 100 Cal.App.3d 558.)

■   Once deciding that *Doyle* error occurred, we must next determine whether defense counsel's failure to object to the prosecutor's tactics constituted incompetence. The failure of counsel to object to evidence usually involves tactical decisions on counsel's part and seldom establishes counsel's incompetence. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].)

In this case, we have an affidavit by defense counsel explaining his failure to object. He states: "At the trial, the prosecutor impeached Mr. Eshelman by asking him why he did not tell his exculpatory version of the homicide to his lover, Susan Hyde, the decedent's mother, in conversation that he had with her after his arrest and *Miranda* warnings. I had advised Mr. Eshelman not to talk to Ms. Hyde at all after he was arrested. [¶] . . . I did not object to the above line of questions because it was my intention to not call undue attention to the Defendant's answers and also to create the appearance that there was nothing to hide concerning the conversations. The Defendant had continued to meet with the witness, contrary to my instructions, right up to the time that he was remanded into custody following his conviction. . . . it [*sic*] would be reasonable to expect, as a juror, that the topic of the shooting had been discussed and I did not want the jury to

speculate that a confession of some sort existed but was kept out of the trial."

Counsel's tactical reasons for failing to object appear reasonable. We therefore conclude that appellant has not shown that counsel exhibited incompetence in this matter.

Assuming for argument's sake there is no rational purpose for not objecting to the references to appellant's silence, appellant has not met his additional burden of demonstrating that, absent counsel's omission, the jury would have accepted his defense of accidental death. (See *People* v. *Ledesma, supra,* 43 Cal.3d 217-218.) ■ The record as a whole demonstrates that the *Doyle* error was harmless beyond a reasonable doubt. (*People* v. *Crandell, supra,* 46 Cal.3d 879; *People* v. *Galloway, supra,* 100 Cal.App.3d 559.)

First, the references to appellant's silence constituted only a minor role in the People's case. (See *Chapman* v. *California* (1967) 386 U.S. 18, 25-26 [17 L.Ed.2d 705, 711-712, 87 S.Ct. 824, 24 A.L.R.3d 1065].) As respondent points out, the prosecutor did not ground the People's proof of intentional killing thereon, but on the physical evidence surrounding the shooting.

Second, the evidence supports the finding of guilt.[1] (See *People* v. *Belmontes* (1988) 45 Cal.3d 744, 787 [248 Cal.Rptr. 126, 755 P.2d 310].) Appellant's alleged feelings of fear of the victim turned into panic are unsubstantiated considering the evidence that Rick did not ever physically harm his mother or appellant, that appellant's claims that Rick verbally threatened his mother and himself are not corroborated, and that Rick never carried a weapon. On the other hand, appellant's hostility toward the victim is amply documented in the record, including his resentment of Rick for interfering in a fight between his mother and sister, appellant's long-standing, obsessive anger over the rock-throwing incident, Susan's attempts at the end to keep appellant away from Rick, and appellant's grabbing of his gun the last two times he merely noticed Rick outside the trailer.

Further, appellant's defense is implausible. In this regard, the references to his silence did not touch a "live nerve" in his defense. (See *People* v.

---

[1] We disagree with respondent that there additionally was no prejudice because appellant later testified on redirect that his counsel advised him not to talk to Susan, and such testimony took the place of a curative admonition to the jury had defense counsel objected. Permitting the defendant to explain the reasons for his silence is unlikely to overcome the negative inference that the jury is likely to draw from the emphasis on defendant's postarrest silence. (*People* v. *Galloway, supra,* 100 Cal.App.3d 557, citing *United States* v. *Hale, supra,* 422 U.S. 180.)

*Modesto, supra,* 66 Cal.2d 714.) Appellant contended that: 1) he reacted in panic-stricken fear to Rick's "charge," and 2) he aimed at the ground as a "warning shot." However, there are no corroborative facts to substantiate these claims. The evidence reveals that at the time of the shooting Rick was not carrying a weapon, was not threatening anyone, had his hands full with duffle bags and laundry, and was attempting to back away, contradicting appellant's theory that Rick posed a serious physical threat. The evidence also indicates that appellant fired the gun from waist level straight out the trailer door where the victim was standing several feet away from and below the door, contradicting appellant's claim that he aimed the gun at the ground.

*Punishment*

■ Appellant next contends that his sentence constitutes cruel and unusual punishment. The basis of his contention is that Penal Code section 1203.06's prohibition of probation denies a sentencing court any discretion in fashioning a punishment which fits the offender. In this case, he argues the punishment of a long prison term is disproportionate to his low culpability, and, but for the statute, the trial court was inclined to grant him probation. The trial court noted that had it had authority in this area, it would have considered, but not necessarily granted, probation.

Section 1203.06, in existence since 1975, prohibits probation to anyone, *regardless* of any unusual circumstances in the interest of justice, who personally uses a firearm in the commission of certain offenses. (*People* v. *Main* (1984) 152 Cal.App.3d 686, 690, 691 [199 Cal.Rptr. 683].) One of these offenses is murder. (§ 1203.06, subd. (a)(1)(i).) The Supreme Court has approved legislative authority to deny probation to persons who use guns in the commission of certain crimes. (*People* v. *Main, supra,* p. 691, citing *People* v. *Tanner* (1979) 24 Cal.3d 514 [156 Cal.Rptr. 450, 596 P.2d 328].)

In light of the seriousness of appellant's crime, his argument that he should be entitled to probation is unpersuasive.

He contends that his prison sentence failed to take into account numerous personal mitigating factors, including his age (around 64 years) and health, his lack of a prior criminal record, his lack of a drug or alcohol problem, the lack of sophistication or planning involved in his offense, and his lack of economic motive to commit more crimes. Appellant asserts that these factors indicate his level of culpability is low and he is not likely to be a danger to others.

In determining whether a sentence is disproportionate to the crime, especially relevant is the nature of the offense and/or the offender, with

particular regard to the degree of danger both present to society. (*In re Lynch* (1972) 8 Cal.3d 410, 425 [105 Cal.Rptr. 217, 503 P.2d 921].) The factors that appellant cites do not outweigh the serious nature of his offense. Murder, even without the use of a firearm, is a serious felony. (Pen. Code, § 1192.7, subd. (c)(1).) The intentional killing of another human being is the ultimate expression of violence, particularly, as in this case, where the victim was unarmed.

The denial of probation in such a case, regardless of the presence of mitigating circumstances, is not a penalty out of proportion to the offense so as to shock the conscience and violate the prohibition against cruel or unusual punishment. (See *In re Lynch, supra,* 8 Cal.3d 423-424.) Pursuant to section 1203.06, it is the public will to put in prison those who commit serious offenses with firearms. Appellant's one crime makes him a danger to society; a grant of probation would have been inappropriate here.

The judgment is affirmed.

Gilbert, J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 23, 1991.