Filed 7/14/22  P. v. Jacquett CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C091059 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2019-0003800) |
| v. | |
| RAYMOND AUSTIN HASSON JACQUETT IV, | |
| Defendant and Appellant. | |

Defendant Raymond Austin Hasson Jacquett IV was convicted by a jury in a murder-for-hire case.  Dr. Thomas Shock, a podiatrist, was shot multiple times in the doorway of his home in Lodi.  The jury found defendant guilty of second degree murder for his role in the killing organized by codefendant Robert E. Lee (Lee) in revenge for Dr. Shock's treatment of Lee's wife Bonnie Lee, which Lee believed led to her suffering and death.

1

Defendant contends his counsel was constitutionally ineffective in: (1) introducing the testimony of defendant—the sole witness for the defense—with the statement that "[t]he defense needs to raise a reasonable doubt," which erroneously shifted the burden of proof beyond a reasonable doubt to defendant; and (2) failing to object to the prosecutor's cross-examination that touched on defendant's silence after receiving *Miranda*[1] warnings—i.e., that trial was the first time defendant told anyone his version of the events—as well as to the prosecutor's closing argument, which highlighted that defendant's testimony at trial was the first time he told "this story." Lastly, defendant contends the case should be remanded for resentencing because the court mistakenly believed he was statutorily ineligible for probation.

We agree with defendant's final claim and will remand for resentencing, in all other respects we affirm the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

## I

### *Trial*

### A. *Prosecution's case*

Cheri Lee is the daughter of Lee. Her mother, Bonnie passed away in 2016. Lee and Bonnie were married when they were 16 or 17 years old. Bonnie had numerous health problems, including with her foot. Dr. Shock treated Bonnie for her foot problems. Bonnie was treated for an ingrown toenail, which became infected and resulted in her having several toes and half of her foot amputated. Bonnie was in great pain. Lee had to retire to care for her. Lee blamed Dr. Shock for Bonnie's suffering and death. After she died, all Lee would talk about with Cheri was about how he would not rest until he got his revenge.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

Lee told Cheri about his plans to kill Dr. Shock. Lee said he had met some men who were going to help him, and they had staked out Dr. Shock's house. Lee said he met one of the men selling CDs in front of an am/pm store, and asked him if he knew somebody that could help with killing Dr. Shock. Lee said he met with some individuals at a restaurant in Sacramento to discuss the murder. Cheri told Lee that he would get caught and he needed to let it go.

On August 1, 2018, sometime between 11:00 a.m. and 2:00 p.m., Jason Glissman, a sheriff's deputy who lived near Lee, saw a white sports utility vehicle (SUV) with a black male in the driver's seat parked near Lee's residence. Glissman had not seen this vehicle or the driver in the neighborhood before. Glissman was going to ask the driver if he needed assistance, when Lee stepped out of his residence. Glissman approached Lee on his porch and checked to make sure that everything was okay with him.

On August 1, 2018, Dr. Shock was living on Rivergate Drive in Lodi with his wife of 45 years, Nancy. Dr. Shock was retired. Nancy went upstairs to bed sometime between 9:00 and 9:30 p.m. Dr. Shock was working downstairs in the office.

Around 9:45 p.m. on August 1, 2018, Charles Mauch, the Shocks' neighbor, heard three loud gunshots. Mauch waited a minute or two and looked out the window. He saw a light-colored station wagon or SUV driving past Dr. Shock's house without its lights on. Mauch could not see who was driving. The car went one or two blocks, turned on its lights and disappeared. Mauch saw that Dr. Shock's front door was open and something was in the doorway. Mauch got dressed, went to Dr. Shock's house, and saw him lying in the doorway in a pool of blood. Mauch also observed some documents lying on the porch. He called 911 and a police officer arrived shortly thereafter.

Khadijeh Ibrahim was walking across the street from Dr. Shock's residence around 9:45 p.m. on August 1, 2018. She saw a house with the door open, heard a shot, and saw a tall, thin man running away from the house. A car was parked in front of the house. The man got in the car, which took off.

3

Piper Loomis was driving in the neighborhood of Dr. Shock's house around 9:45 p.m. on August 1, 2018. Loomis's cousin was driving Loomis's car home from a youth event. On the way, as they drove by the Shocks' residence, they saw a gray or white SUV with the engine running and the lights on, but no one inside it. They circled back around and, as they were passing the Shocks' house, they heard two gunshots. They swerved towards the gate to Loomis's house on the same street, because they thought someone was shooting at their car.

On August 1, 2018, a police officer dispatched to the Shocks' home arrived just before 10:00 p.m. and found Dr. Shock lying in the entryway unresponsive. Dr. Shock had gunshot wounds to the head, chest and arm. The officer could see blood and some bone fragments on the ground. Dr. Shock was declared dead at the scene.

Nancy Shock was awakened by the police coming in the house. From the top floor, Nancy could see Dr. Shock lying on the floor. She knew he was dead because his body was covered.

An autopsy determined that Dr. Shock had been killed by three gunshots fired at close range to the head and chest. Two bullets were recovered from Dr. Shock's body. A comparison of the bullets determined that they were most likely fired from the same weapon, likely a revolver. No shell casings were discovered at the scene. The lack of shell casings suggested that the shooter either picked them up or used a revolver, from which shells have to be ejected manually. The detective assigned to the case, Michael Hitchcock, determined that Lee was the registered owner of three .38-caliber revolvers. Hitchcock did not find any revolvers in a search of Lee's home, but did recover .38-caliber ammunition.

Law enforcement officers found a piece of paper near Dr. Shock's body. Detective Hitchcock determined that the piece of paper was part of medical board complaint against Dr. Shock involving Robert and Bonnie Lee. Hitchcock found the remainder of the complaint, missing the one page that was found near Dr. Shock's body,

4

in Lee's home. The staple holes on the piece of paper matched the staple holes in the rest of the complaint. The paper found by Dr. Shock's body was analyzed for fingerprints and found to contain the prints of codefendants Mallory Stewart and Christopher Costello.[2]

Video cameras at a residence on River Oaks Drive and Turner Road, and a stereo store on the corner of Church Street and Turner Road, captured images of a vehicle traveling on Rivergate Drive on August 1, 2018, at the time relevant to the shooting. Detective Hitchcock determined defendant's car appeared to be the same vehicle seen in the video on the night of the shooting. When defendant was arrested, he was driving a white Mitsubishi Montero. At the time of his arrest, the Montero's license plates had been switched back to front, that is the license plate that was affixed to the front of the vehicle had the year and month stickers on it, which should be on the rear license plate. They were properly located on July 30, 2019, and August 1, 2018, at 3:35 p.m.

In August 2018, Shiedgar Peterson was codefendant Stewart's girlfriend. Stewart lived in Sacramento. In August 2018, Stephanie Williams was codefendant Costello's girlfriend. Williams had one child with Costello. She lived in Stockton. Costello grew up in Sacramento and sometimes stayed with family or friends there. Costello was a rapper who used the name "Yung Cos."

Sara Morin, a criminal intelligence specialist with California's Department of Justice, an expert in cell site analysis, testified regarding cell phone activity for "target" telephone numbers associated with Stewart, Costello, Lee, and defendant, including the numbers of Stewart's and Costello's girlfriends, in and around the time of Dr. Shock's murder.

---

[2] On May 6, 2019, defendant's case was ordered severed from those of the codefendants and he was the only defendant to commence jury trial on June 18, 2019.

Morin testified that in the days leading up to the murder, between July 27, 2018, and July 31, 2018, there were multiple contacts between defendant's phone number and those associated with Stewart, Costello and Lee, and Stewart's and Costello's girlfriends.

Morin testified that on the day of the murder, August 1, 2018, the target phones were connecting frequently throughout the day up until 8:21 p.m. Morin testified that from 8:21 p.m. to 10:13 p.m., there was a break in defendant's phone's cell site activity. There was a break in all activity from 9:30 p.m. to 10:13 p.m. From 9:36 p.m. to 10:03 p.m., there was a break in activity from all cell phones associated with Costello, Stewart, defendant and Lee.

At 10:03 p.m., Lee's phone called Costello's Yung Cos phone and again at 10:06 p.m. At 10:12 p.m. and 10:13 p.m., defendant's phone attempted to call Stewart's phone. At 10:15 p.m., Costello's Yung Cos phone attempted to call defendant's phone. At that time, defendant's phone connected to two different cell sites just north of Lodi, consistent with someone driving northbound. By 11:31 p.m., defendant's phone was connecting with a cell site that encompassed his residence in Sacramento.

Morin summarized the pattern of activity and breaks in activity of cell phones associated with Stewart, Costello, Lee and defendant at and around the time of Dr. Shock's murder. For defendant's phone, the Stewart phone was a commonly called number with over 750 contacts from July 1, 2018, to September 18, 2018. Defendant had only two contacts with Costello's girlfriend's phone, both on August 1, 2018, and fewer than 10 contacts with Costello's Yung Cos phone, all on August 1 and August 2. August 1, 2018, was the only time defendant's phone connected to a cell site in the Lodi area.

The day after Dr. Shock was murdered, Lee came over to Cheri's house. Lee explained to Cheri how the murder occurred. Lee told her that he was in the car with the man he had met at the am/pm and two other people when Dr. Shock was killed. He said the man he met at am/pm was the driver. Lee said the man with the long dreads went to

6

Dr. Shock's door and showed him a paper.[3] When Dr. Shock looked down at the paper, the man shot the doctor in the head. When he [the shooter] got back in the car, Lee asked the driver to drive by Dr. Shock's house, because Lee wanted to see the doctor dead on the ground. Lee said the gun used was a .38 revolver and he let the man [shooter] take it with him.

Lee told Cheri that he paid the men $5,000 to commit the crime. The shooter got the most money and the driver of the car got the least. Lee's bank records were obtained with a search warrant. Records showed that Lee deposited and immediately withdrew $5,000 a day or two before the murder. When Lee was in jail, Lee tried to persuade Cheri to supply receipts totaling $3,500 to cover his withdrawal of the money. Cheri told Lee she would not lie for him.

During the search of Lee's house, a note was found in his bedroom that read in part, "Maybe I will find out why God took Mom so soon and let her suffer so. I believe in an eye for an eye, a truth for a truth. I hope Shock spends his time in hell will [*sic*] and I get to see him face to face, the dirty bastard Shock."

### B.    *Defense case*

Defendant testified on his own behalf. He told the jury that on August 1, 2018, he worked from 6:00 a.m. to 2:30 p.m. at ADCO in north Sacramento. When defendant returned home after work, he got a phone call from Stewart, who invited defendant to Stewart's house and defendant drove over. Defendant had known Stewart since they were 12 or 13 years old, probably 13 or 14 years. When defendant got to Stewart's house, Costello was there. Defendant also knew Costello for about 13 years. Defendant, Stewart and Costello went to middle school together.

---

[3] It is unclear to us whether the man with the long dreads, is the same man whom the defendant had met selling CDs at am/pm.

About 20 minutes into defendant's conversation with Costello, Stewart asked if he could get a ride to Lodi. Stewart said he had a friend in Lodi named Robert Lee, who grew marijuana and was going to give Stewart marijuana. Defendant agreed to take Stewart and Costello to Lodi.

When they arrived at Lee's house, Costello told defendant to wait in the car. He was waiting 40 to 45 minutes. After about 20 minutes, defendant saw a car pull up and park in front of Lee's house; the driver went into Lee's house. Defendant identified the driver as Deputy Glissman. Glissman was there about two minutes and left.

About 20 minutes later, Costello came out and asked for a ride to Stockton. Defendant gave Costello a ride to Stockton. Costello directed him where to go. After dropping off Costello in Stockton, defendant returned to Lee's house in Lodi. He pulled into the driveway and waited for about 45 minutes until Stewart came out and told defendant that they were almost ready to leave. Defendant waited another 15 minutes, and Stewart came out again, and invited defendant into Lee's house. Defendant introduced himself to Lee and Lee gave defendant a soda. Stewart said they would be back and defendant gave him the keys to defendant's car. Defendant was left alone in Lee's house.

Defendant was waiting about 35 or 45 minutes at Lee's house while Lee and Stewart left to get the marijuana plants. After about 45 minutes, they returned. Shortly thereafter defendant went back to Sacramento.

Defendant denied switching the license plates on his car and did not know they were on backwards.

Defendant denied ever being told that the plan that evening was to kill someone.

## C.    *Verdict and Sentence*

On July 17, 2019, the jury found defendant guilty of second degree murder, but found not true the allegations that defendant committed the murder of Dr. Shock, deliberately, willfully and with premeditation or for financial gain.

8

On November 21, 2019, defendant filed a motion for new trial, which the trial court subsequently denied. Thereafter, the court sentenced defendant to 15 years to life in state prison.

Defendant timely appealed.[4]

## DISCUSSION

### I

### *Ineffective Assistance of Counsel Claims*

#### A.    *Comments on Burden of Proof*

Defendant claims defense counsel was ineffective in (1) introducing his testimony with a legally erroneous statement that encouraged jurors to evaluate his testimony as if he bore the burden to raise a reasonable doubt that he committed the murder of Dr. Shock, and (2) failing to object to the prosecutor's improper opening argument indicating that reasonable doubt was a defense that depended on whether the jury believed defendant's version of the events.

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.] 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no

---

[4] This case was fully briefed and assigned to this panel on January 31, 2022.

satisfactory explanation,' [citation], the contention must be rejected." ' [Citations.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 845-846; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-696; *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 54-55.)

Defense counsel chose to reserve his opening statement until the defense case. During that opening statement, and immediately before defendant testified, defense counsel told the jury: "I'm going to give an opening statement here that will be among the briefest of opening statements that you'll ever hear. [¶] My case, my defense, [defendant's] defense, is [defendant] testifying to you regarding the events in question. The prosecution's job is to prove the case by introducing all the evidence they've introduced. *The defense needs to raise a reasonable doubt.* And I believe, based on the questions that have been asked so far and [defendant's] testimony and subject to cross-examination by [the prosecutor], we will have accomplished our mission. So thank you very much." (Italics added.)

In a criminal case, "[T]he *prosecution* must prove every element of a charged offense *beyond* a reasonable doubt. The accused has *no* burden of *proof* or *persuasion*, even as to his defenses. [Citations.] However, once the prosecution *has* submitted proof that permits a finding beyond a reasonable doubt on every element of a charge, the accused may obviously be obliged to respond with evidence that 'raises' or permits reasonable doubt that he is guilty as charged. [Citations.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1214-1215, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.)

Here, we interpret defense counsel's introduction to defendant's testimony as that described in *Gonzalez*, i.e., where the prosecution has presented evidence that permits the jury to find that a defendant is guilty beyond a reasonable doubt, then the defense is "obliged to respond with evidence that 'raises' or permits reasonable doubt that he [or she] is guilty as charged." (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1215.) In *Gonzalez*, the defendant claimed that the prosecutor misstated the law during his closing

argument by asserting that " '[t]he defense has to create a reasonable doubt . . . . The reasonable doubt has to be created by the defense. They have not created any reasonable doubt. Confusion, yes, but reasonable doubt, no.' " (*Id.* at p. 1214.) The court in *Gonzalez*, after first noting that it is the obligation of the prosecution to prove every element of a charged offense beyond a reasonable doubt, found the prosecutor's remarks to be "proper if it meant only that the prosecution had proved [crime] beyond a reasonable doubt, and that the weakness of the defense response had left the record devoid of any basis for reasonable doubt." (*Id.* at p. 1215.) The *Gonzalez* court also rejected the defendant's claim that his counsel was ineffective for failing to object to the prosecutor's comments. "Nor is the point persuasive when phrased as ineffective assistance of counsel. The prosecutor's remark was brief and mild. The jury received accurate standard instructions that the People bore the burden of proving defendant guilty beyond a reasonable doubt, and that he was presumed innocent until proven guilty. (CALJIC No. 2.90; see also CALJIC Nos. 2.01, 5.15, 8.71, 8.72, 8.80.) No instruction stated or implied that defendant bore any burden of proof or persuasion. Defense counsel in his closing argument reread CALJIC No. 2.90 and repeatedly emphasized the People's 'very, very, very high burden.' The evidence that defendant was guilty as charged was highly persuasive. Hence, counsel's failure to object to the prosecutor's 'reasonable doubt' argument does not undermine confidence in the guilty verdict." (*Ibid.*)

We reject defendant's claims for similar reasons.

To the extent that counsel referred to defendant's testimony as a "defense" or suggested that defendant bore the burden of proof, we note that, as in *Gonzalez*, "[t]he jury received accurate jury instructions that the People bore the burden of proving defendant guilty beyond a reasonable doubt, and that he was presumed innocent until proven guilty. [Citations.] No instruction stated or implied that defendant bore any burden of proof or persuasion." (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1215; see CALCRIM Nos. 220, 224, 225, 520, 521, 700, 704, 705.)

11

In context, we conclude that counsel's remark can only be taken to mean that, now that the jury has heard the prosecution's case, all defendant must do to earn an acquittal is to raise a reasonable doubt as to his guilt.

The second claim by defendant is in regard to the prosecutor's comments. The prosecutor stated the following in rebuttal argument: "This is a case where it's all or nothing. If you believe his story, it's not guilty, very simply. If you don't believe his story, then he's guilty, guilty of the special circumstance murder, because there is no reason for him to be down there." Defendant contends this argument was improper because it again shifted the burden of proof to the defense. We disagree.

As defendant concedes, the prosecutor correctly reminded jurors in his argument that *he* bore the burden of proof. "Everything I prove in this case has to be proven beyond a reasonable doubt." The prosecutor then quoted the reasonable doubt jury instruction: "That's proof -- proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. It need not eliminate all possible or imaginary doubt, because everything in life is open to some possible or imaginary doubt." The prosecutor also reminded the jurors that reasonable doubt must be proven with regards to circumstantial evidence: " 'Before you conclude that a fact necessary to find the defendant guilty has been proven, you must be convinced beyond a reasonable doubt that each fact has been shown beyond a reasonable doubt. If there are two or more reasonable inferences, one that points to guilt and one that points to innocence, you have to accept the one that points to innocence.' " The prosecutor exhorted the jury in closing argument, that when considering circumstantial evidence, the jury should consider all of the evidence as a whole. He argued "just because defendant is driving a car on Rivergate Drive doesn't mean he's guilty. So you don't just look at each piece [of evidence] and say, you know, he's not guilty because that doesn't prove he did a murder. You look at all of them together: His car, the phone, the license plates, his interaction with all the different people. You look at all the evidence together to decide whether the case has

12

been proven." The prosecutor concluded that what the prosecution had shown was "proof beyond a reasonable doubt that the defendant is guilty of murder special circumstance, first degree murder."

Defense counsel also emphasized the prosecution's burden in his closing statement: "[Defendant]'s alleged to be the getaway driver. He says he's not. It's up to the District Attorney to prove beyond a reasonable doubt that he was." Defense counsel argued that the prosecutor had built "a beyond-a-reasonable-doubt case" against Lee and Stewart, but "it's a much different story as to [defendant]." Counsel then argued that the prosecution had failed in its burden to prove special circumstances beyond a reasonable doubt, i.e., that defendant murdered Dr. Shock for financial gain, an argument with which the verdict indicates the jury agreed. Counsel repeated that: "[Defendant] says it wasn't him. The prosecution must prove with actual evidence that it was [defendant]. You, as a jury, to convict [defendant] . . . must believe he's guilty beyond a reasonable doubt that it was him." Defense counsel concluded by declaring that "[p]roof beyond a reasonable doubt is the most important concept in our criminal justice system," and read CALCRIM No. 220 on reasonable doubt to the jury.

Against this background, we are not persuaded that defense counsel was ineffective in failing to object to the prosecutor's isolated remark. Indeed, in *People v. Marshall* (1996) 13 Cal.4th 799, the California Supreme Court similarly rejected a defendant's claim of ineffective assistance when defense counsel failed to object to the prosecutor's argument that the defense wanted to present the testimony of another individual, because " '[t]hey had to come up with another possible suspect to create in your minds that reasonable doubt that they want you to have when you enter that jury deliberation room.' " (*Id.* at p. 831.) The defendant in *Marshall* asserted it was prosecutorial misconduct to suggest in closing argument that "it was incumbent on defendant to raise a reasonable doubt concerning his guilt, and to do so not just by

13

providing evidence he was not the killer, but by affirmatively showing who the killer was." (*Ibid.*)

The *Marshall* court said: "In the context of the whole argument and the instructions, we see no reasonable likelihood [citation] the jury construed the prosecutor's remarks as placing on defendant the burden of establishing a reasonable doubt as to his guilt. When the prosecutor made the challenged comment, he had just finished reviewing the evidence presented in the prosecution's case-in-chief, with the evident aim of demonstrating he had succeeded in proving defendant guilty beyond a reasonable doubt. As in *People v. Gonzalez, supra*, 51 Cal.3d at page 1215, the prosecutor then could legitimately argue that in order persuasively to cast doubt on the prosecution's case, the defense of third party culpability would need to identify a possible perpetrator. Accordingly, defendant fails to establish either misconduct or, it follows, ineffective assistance of counsel." (*People v. Marshall, supra*, 13 Cal.4th at pp. 831-832, citing *Strickland v. Washington, supra*, 466 U.S. at pp. 691-692; see also *People v. Earp* (1999) 20 Cal.4th 826, 864 [no improper shifting of the burden of proof, when prosecutor argued " 'there is no reasonable doubt in this case unless you believe [defendant] is telling the truth,' " which "merely invited the jury to compare defendant's explanation of the evidence with the prosecution's while stressing to the jury that the prosecution had proven its case beyond a reasonable doubt"].)

We conclude that defendant failed to establish that his counsel was ineffective in failing to object to the prosecutor's comments.

**B.** **Examination and Argument on Defendant's Post-Miranda Silence**

Defendant contends defense counsel was also deficient in failing to object to (1) the prosecutor's questions on cross-examination confirming that defendant had not told his version of the events to anyone until he testified at trial, and (2) commenting on that fact in closing argument. In both instances, defendant contends the prosecutor violated the prohibition on commenting on a defendant's silence after being advised of

14

his or her rights under *Miranda v. Arizona, supra,* 384 U.S. 436. (See *Doyle v. Ohio* (1976) 426 U.S. 610, 617-618.)

On direct examination, defendant testified that at the time of the murder, he was at Lee's house, having given the keys to his car to Stewart and Lee to go get marijuana plants from a friend of Lee's. They returned 45 minutes later without the plants.

In cross-examination, the prosecutor had the following exchange with defendant:

"Q  And today's the first day that you've told this story, correct?

"A  Yes.

"Q  You've had people come visit you?  You've had 35 visitors at the jail, correct?

"A  Yes.

"Q  Mom, dad, friends, and family, right?

"A  Yes.

"Q  And you never told them this story that you're telling us here today, right?

"A  Yes.

"Q  It's the very first time?

"A  Yes."

In closing argument, the prosecutor referred to this testimony:  "It's the first time ever that he's told this story after sitting through the evidence at this trial, the prelim, and reading all the evidence that is -- that he has in the case, the first time ever [he] told the story."

Defense counsel did not object to either the prosecutor's cross-examination or his comments in closing argument.  "Defendant forfeited any challenge to the admission of the evidence by failing to object at trial, so we proceed to his claim of ineffective assistance of counsel.  (*People v. Huggins* (2006) 38 Cal.4th 175, 198; *People v. Hughes* (2002) 27 Cal.4th 287, 332.)"  (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1554.)

15

The People do not dispute that when defendant was arrested, officers read him his *Miranda* rights and asked defendant if he wanted to tell his version of the events. Defendant declined to do so, and the officers ceased questioning about the events.

"In the present case, to determine whether counsel's performance was incompetent, we must first decide if the prosecutor committed *Doyle* error. Defense counsel's performance cannot be considered deficient if there was no error to object to." (*People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1520 (*Eshelman*).)

"*Doyle v. Ohio* is founded on the notion that it is fundamentally unfair to use a defendant's post-*Miranda* silence to impeach his trial testimony in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized. (*Wainwright v. Greenfield* (1986) 474 U.S. 284, 291-292; *People v. Crandell* (1988) 46 Cal.3d 833, 878.) Similar reasoning supports the conclusion that comments which penalize the right to counsel also are prohibited. (*People v. Crandell, supra*.)" (*Eshelman, supra*, 225 Cal.App.3d at p. 1520.)

"*Doyle* and the majority of the cases interpreting it concern a defendant's postarrest failure to explain his conduct to the *police*." (*Eshelman, supra*, 225 Cal.App.3d at p. 1520.) As in the *Eshelman* case, here the prosecutor referred to defendant's silence only in regard to his refusal to explain his crime to a *private citizen*. The *Eshelman* court held that "Based on *Doyle*'s rationale, we think that the test in applying *Doyle* should focus on the circumstances surrounding defendant's post-*Miranda* silence. *Doyle* need not apply to defendant's silence invoked by a private party absent a showing that such conduct was an assertion of his rights to silence and counsel. (See *People v. Martin* [(1980)] 101 Cal.App.3d [1000,] 1007, 1009.) On the other hand, when the evidence demonstrates that defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights, then *Doyle* should apply." (*Eshelman, supra*, 225 Cal.App.3d at p. 1520.)

16

In *People v. Galloway* (1979) 100 Cal.App.3d 551, the court concluded that *Doyle* error occurred when the prosecutor asked the defendant, " 'This was the first time you have told anyone where you were on May the 21st, 1977, is that correct?' " (*Id.* at p. 556.) "In addition to his cross-examination, the prosecutor twice argued that appellant, while examined as a witness, remembered and told people for the first time where he was on May 21, 1977." (*Id.* at p. 558.) The court said: "When combined with the prosecutor's closing arguments, the purpose of his questions was clearly to convey the impression appellant's explanation was fabricated." (*Id.* at p. 557.)

The court in *Galloway* rejected the proposition that *Doyle* "only applied to questions directed to a defendant's failure to talk to *police* after he has been arrested and given his *Miranda* rights." (*People v. Galloway, supra*, 100 Cal.App.3d at p. 557.) *Doyle* error occurs even when the prosecutor is permitted to examine the defendant about his or her silence with respect to private parties (i.e., family and friends), as well as the police, after receiving *Miranda* warnings. (*Ibid.*; see also *People v. Earp, supra*, 20 Cal.4th at p. 857; cf. *Eshelman, supra*, 225 Cal.App.3d at pp. 1520-1521 [*Doyle* applies to silence before a private party if results primarily from defendant's conscious exercise of constitutional rights]; but see *People v. Medina* (1990) 51 Cal.3d 870, 889-891 [jury could draw adverse inference from defendant's conversation in jail with his sister where the record did not suggest that defendant believed he was being monitored or intended his silence to invoke a constitutional right].)

Unlike the defendant in *Eshelman*, the defendant here was not asked why he hadn't told this story before, and he did not offer an explanation. Thus, the record is devoid of any evidence of defendant's motivation for not having previously told "this story," or any story for that matter. Nonetheless, we find that the inference from the prosecutor's questioning of defendant and from the prosecutor's remarks in closing argument, is that defendant's failure to tell this story before meant that he had something to hide. Like the court in *Eshelman*, "[W]e believe that this indicates the improper

17

purpose of the prosecutor's questions was to utilize appellant's silence to impeach his defense and thereby to solemnize the silence into evidence of guilt.  (See *People v. Modesto* (1967) 66 Cal.2d 695, 713; *People v. Galloway, supra*, 100 Cal.App.3d 558.)" (*Eshelman, supra*, 225 Cal.App.3d at p. 1521.)  Thus, we conclude that *Doyle* error occurred.

Having determined that *Doyle* error occurred, we turn to an examination of whether defense counsel's failure to object to the prosecutor's questioning of defendant and related comment in closing argument, constituted ineffective assistance of counsel. Having failed to raise this issue in the trial court, defendant has a difficult burden on appellate review.

As we mention above, to prevail on an ineffective assistance of counsel claim, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland v. Washington, supra*, 466 U.S. at pp. 688, 691-692.) A reviewing court may reject an ineffective assistance of counsel claim addressing both components if a defendant makes an insufficient showing as to either prong.  (*Id.* at p. 697.)

" 'In determining whether counsel's performance was deficient, we exercise deferential scrutiny.  [Citations.]  The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics.  [Citation.]  [¶]  Our Supreme Court recently reiterated the obligations of appellate courts in reviewing claims of ineffective assistance of counsel:  " ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of professional assistance.' " [Citation.]  "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if

difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' " [Citation.]' [Citation.]" (*People v. Loza* (2012) 207 Cal.App.4th 332, 351.)

As the Supreme Court described in *People v. Mendoza Tello*, " ' "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' (*People v. Wilson* (1992) 3 Cal.4th 926, 936, quoting *People v. Pope* (1979) 23 Cal.3d 412, 426.) A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. (*People v. Wilson, supra*, at p. 936; *People v. Pope, supra*, at p. 426.)" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

The record does not disclose that defense counsel had no rational tactical purpose for failing to object to the prosecutor's question or closing argument. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 ["a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance"].) We note that the prosecutor's framing of the question to defendant, and his subsequent argument that this was the "first time ever that he's told this story," was rather broad and not entirely clear. Defense counsel could reasonably have concluded that an objection would have served to emphasize an area that the jury may not have been particularly focused on. Thus, we do not find counsel's performance was deficient.

Even were we to find counsel's performance deficient, we find that defendant has failed to carry his burden of showing that he was prejudiced by such.

Defendant maintains that this was a close case, pointing out that the prosecution's evidence was circumstantial, and the jury twice asked for a readback of his testimony. However, the evidence against defendant was compelling and was not based in the least

19

on defendant's failure to tell his version of events prior to his testimony at trial. Surveillance video showed that defendant's car was on Dr. Shock's street at the time of the shooting. Cell phone records showed multiple phone calls between phones belonging to or associated with Stewart, Costello and defendant in the days leading up to the murder, and on the day of the murder. The day of the murder was the only time that defendant's phone connected to a cell site in Lodi. Critically, during the murder, cell phone traffic on Stewart's, Lee's and defendant's phones ceased but resumed after the murder. Defendant testified on cross-examination that during the murder he was alone at Lee's house on the phone with his "ex," but there were no connections to his phone at local cell sites in Lodi, as there were for his other calls on August 1, 2018. Finally, Lee's daughter testified that, when Lee confessed to the murder, he said there were three people in the car, two besides himself. Since defendant testified he had dropped Costello off in Stockton, the evidence supports that the three people in the car were Lee, Stewart and defendant. On balance, we do not find it at all likely that the admission of evidence of defendant's pretrial silence and the prosecutor's reference to it in closing argument, in comparison to the abundance of evidence of defendant's guilt, influenced the jury's verdict.

In view of the totality of the evidence, see no reasonable probability that defense counsel's failure to object to the error that we have described influenced the jury verdict such that there is a substantial likelihood of a more favorable result for defendant had the objection been made. Thus, we reject defendant's claim of ineffective assistance of counsel.

## II

### *Denial of Probation*

Defendant contends that the case must be remanded for resentencing because the trial court mistakenly believed that he was statutorily ineligible for probation and the court was unaware of the scope of its sentencing discretion. The People concede the

error but argue that defendant forfeited the issue by failing to object to the probation report where the error originated.  The People further maintain that the error was harmless.  Anticipating the forfeiture argument, defendant argues that his counsel's failure to object constituted ineffective assistance of counsel.

All defendants are eligible for probation, in the discretion of the sentencing court, unless a statute provides otherwise.  (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.)  Some statutes bar probation absolutely, while others provide that a defendant is ineligible except in unusual cases where the interests of justice would be served.  (*Ibid.*)  Here, the trial court apparently relied on the probation report to conclude Penal Code sections 1203, subdivision (e)(3), and 1203.075[5] rendered defendant ineligible for probation.

Section 1203, subdivision (e), provides in relevant part, that "[e]xcept in unusual cases in which the interests of justice would best be served if the person is granted probation, probation shall not be granted to . . .  [¶]  . . . [a]ny person who *willfully inflicted great bodily injury or torture* in the perpetration of the crime of which that person has been convicted."  (§ 1203, subd. (e)(3), italics added.)  By its terms, section 1203, subdivision (e)(3), renders a defendant conditionally ineligible for probation only when there has been a finding the injury was willful, i.e., intentional.  (§ 1203, subd. (e)(3); *People v. Lewis* (2004) 120 Cal.App.4th 837, 854.)  Here, there was no such finding.

Section 1203.075, provides that "probation shall not be granted to . . . any person who *personally inflicts great bodily injury* . . . on the person of another in the commission or attempted commission of the following crimes:  [¶]  (1) Murder."  (Italics added.)  Again, there was no evidence that defendant himself personally inflicted the injury that caused decedent's death.

---

[5]  Undesignated statutory references are to the Penal Code.

No other factors affecting probation were listed in the report, including the factors set forth in California Rules of Court, rule 4.414.[6] Rather, the report stated that the officer considered rule 4.413. Rule 4.413(b) provides in relevant part that, where a defendant is presumptively ineligible under a statute prohibiting probation " 'except in unusual cases where the interests of justice would be best served,' " the court should apply the factors set forth in rule 4.413(c) in evaluating whether the presumption is overcome, and where it is, then apply the factors in rule 4.414. The factors in rule 4.413(c) outline circumstances where the statutory limitation on probation is technically present but not fully applicable (rule 4.413(c)(1)) or which reduce the defendant's culpability (rule 4.413(c)(2)). The probation officer concluded: "The defendant is ineligible for probation." Accordingly, the probation report did not discuss the factors in rule 4.414.

Defense counsel filed a sentencing brief requesting a grant of probation but did not object that the probation report erroneously referred to statutes inapplicable to defendant.

At the sentencing hearing, the trial court stated that it had reviewed and considered the probation report. The court expressed its disagreement with some of the report's conclusions but none that related to statutory ineligibility. To the contrary, the court said, "I do find the defendant is statutorily ineligible for probation with the understanding that it does say in unusual circumstances, and at this point I find no unusual circumstances," evidently referring to section 1203, subdivision (e). The court also observed that "defendant didn't inflict the physical injury but facilitated the infliction of physical injury." Nonetheless, the court reiterated, "[a]ccording to the statement given to probation, he would be eligible, but under Penal Code section 1203, subsection (e)(1), based on the nature of the crime he is statutorily ineligible." Defense counsel did not object to the court's erroneous statements.

---

[6] Undesignated rule references are to the California Rules of Court.

We agree that defense counsel forfeited the claim by failing to object to the probation report or the court's erroneous statements at the sentencing hearing, and thus review for ineffective assistance of counsel. We do so again under the standard set forth in *People v. Samayoa, supra*, 15 Cal.4th 795 and *Strickland v. Washington, supra*, 466 U.S. 668. In addition, the California Supreme Court in *People v. Scott* (1994) 9 Cal.4th 331, stated: "Under existing law, a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent. [Citations.]" (*Id.* at p. 351.)

We cannot conceive of a reason for defense counsel's failure to object to the statements in the probation report, echoed by the trial court at the sentencing hearing, that defendant was statutorily ineligible, in both instances citing statutes that did not apply. The error was particularly stark with respect to the probation report's reference to section 1203.075 that by its express terms only applies to a defendant who personally inflicts great bodily injury. Thus, we find counsel was ineffective in failing to object to the clearly erroneous statements in the probation report, and to the court's reliance on those errors.

We next consider whether the trial court's application of an erroneous standard of probation eligibility entitles defendant to a new sentencing hearing. Where, as here, "the sentencing court bases its determination to deny probation in significant part upon an erroneous impression of the defendant's *legal* status, fundamental fairness requires that the defendant be afforded a new hearing and 'an informed, intelligent and just decision' on the basis of the facts. [Citation.]" (*People v. Ruiz* (1975) 14 Cal.3d 163, 168; see also *People v. Sherrick* (1993) 19 Cal.App.4th 657, 661; *People v. Manriquez* (1991) 235 Cal.App.3d 1614, 1620.)

The People concede the trial court's error, but argue remand is not required because such error was abated when the trial court "also conducted an analysis of

23

[defendant's] probation eligibility using the factors in aggravation and mitigation set forth in California Rules of Court, rule 4.414. By relying on rule 4.414 factors, the trial court signaled that it also found [defendant] should have his probation denied even if he was statutorily eligible." We do not think the record is so clear.

While the trial court did enumerate a number of the criteria set forth in rule 4.414, and focused on the prevalence of aggravating factors, the court also expressly invoked the presumptive ineligibility standard of section 1203, subdivision (e)(3), and stated its decision was based on the absence of unusual circumstances that would warrant granting probation. The trial court began the sentencing hearing by announcing its tentative sentencing decision and by referencing defendant's eligibility for probation, "I do find the defendant is statutorily ineligible for probation with the understanding that it does say in unusual circumstances, and at this point I find no unusual circumstances, and so the Court would be inclined to impose the sentence that is indicated for a second degree murder . . . ." The trial court then proceeded to articulate the criteria set forth in rule 4.421, circumstances in aggravation and mitigation. The trial court next enumerated the factors in rule 4.414 but again referenced defendant's (clearly erroneous) ineligibility for probation under section 1203: "Other factors relating to the defendant that the Court considered, this is under California Rule of Court 4.414, subsection (b), the willingness of the defendant to comply with probation. According to the statement given to probation, he would be eligible, but under Penal Code section 1203, subsection (e)(1), based on the nature of the crime he is statutorily ineligible." The trial court concluded its tentative decision by, yet again, referring to defendant's ineligibility for probation: "So again, based on the verdict and the Penal Code 1203, subsection (e), it doesn't appear logical for probation."

Had the trial court merely discussed aggravating factors, without tying them to section 1203, subdivision (e)'s unusual circumstances requirement, we might have accepted the People's contention that the court's error was not a significant factor in the

24

decision to deny probation. However, the trial court's reference to section 1203, subdivision (e)(3), suggests the court may have denied probation, not because aggravating factors made defendant an unsuitable candidate, but because those factors demonstrated the absence of unusual circumstances. On this record, we cannot say the trial court's error was not a significant factor in the decision to deny probation.

The People also argue remand is not required because defendant has failed to show a reasonable probability that the court would have granted probation, absent its error in relying on sections 1203 and 1230.075. We decline to apply a harmless error analysis. (See *People v. Sherrick, supra*, 19 Cal.App.4th at p. 661 ["[w]e cannot 'save' the judgment on a harmless error analysis. While the offenses were undoubtedly serious, the trial court's comments unquestionably demonstrate that it was laboring under a false impression of appellant's legal status"].) As noted, remand is required when the sentencing court bases its determination to deny probation "in significant part" upon an erroneous impression of the defendant's legal status. (*People v. Ruiz, supra,* 14 Cal.3d at p. 168; see also *People v. Alvarez* (2002) 95 Cal.App.4th 403, 409 [remand for resentencing required due to mistaken application of § 1203, subd. (e)(2)]; *People v. Manriquez, supra*, 235 Cal.App.3d at p. 1620 [remand for resentencing required due to mistaken application of § 1203, subd. (e)(1)].) Here, the record demonstrates the trial court misunderstood the scope of its discretion, and may have relied upon the error to deny probation. A new sentencing hearing is therefore necessary for the trial court to consider defendant's probation request under the appropriate legal standard. (*People v. Downey* (2000) 82 Cal.App.4th 899, 912 ["[w]here, as here, a sentence choice is based on an erroneous understanding of the law, the matter must be remanded for an informed determination"].)

## DISPOSITION

The conviction is affirmed. The sentence is vacated, and the case is remanded to the trial court for resentencing in accordance with this opinion.

_____/s/_____
EARL, J.

We concur:

_____/s/_____
HULL, Acting P. J.

_____/s/_____
DUARTE, J.

26