Filed 10/9/23 P. v. Jones CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081282 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE411180) |
| QUINTEN DEJUANLE JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge. Affirmed.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Quinten Dejuanle Jones of battery with serious bodily injury (Pen. Code,[1] § 243, subd. (d); count 1); and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2). As to count 2, the jury found that Jones personally inflicted great bodily injury on the victim (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8).) The court sentenced Jones to a three year term of probation. One of Jones's probation conditions required him to receive permission from his probation officer before traveling outside San Diego County.

Jones appeals, contending the trial court erred when it denied his motion for a mistrial based upon a witness referring to using a booking photograph in preparing a photographic lineup. He also claims the prosecution committed a *Doyle*[2] violation by commenting on Jones's failure to talk to law enforcement. In addition, Jones argues his travel probation condition violates *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*) and is unconstitutionally overbroad.

We conclude that the trial court did not abuse its discretion in denying Jones's motion for a mistrial. We also find that Jones forfeited his claim of *Doyle* error as well as his challenge to the travel restriction. Accordingly, we affirm the judgment.

FACTUAL BACKGOUND

*Prosecution*

A week before the subject altercation, Jones approached R.C. and told him to stop looking in his girlfriend's window. R.C., a male resident of Jones's girlfriend's apartment complex, had an assigned parking spot below

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     *Doyle v. Ohio* (1976) 426 U.S. 610.

2

the girlfriend's second-story window. In response to Jones's warning, R.C. "blew him off," telling Jones he refused to listen to him because he was "not doing anything that [he was] telling [him]." Jones responded, "there ain't going to be a next time, motherfucker."

One week later, R.C. was standing near his truck in the parking lot of his apartment complex. He was smoking a cigarette and drinking a beer, as he talked on the phone with his friend. Suddenly, Jones appeared, hopped on the bumper of R.C.'s truck, and told him to stop looking in his girlfriend's window. Angry because Jones was on his truck, R.C. told Jones to "get the fuck off." Jones asked him "what the fuck [he was] going to do?" Jones then came at R.C. R.C., who had not attacked or punched Jones, lost consciousness. R.C.'s friend heard the fight unfold over the phone.

When R.C. awoke, a neighbor helped him into her garage and called 911. After emergency personnel arrived, R.C. was able to identify Jones's vehicle. Sheriff's deputies found a blood trail leading to Jones's girlfriend's apartment. They approached the apartment and called out Jones's name. No one responded.

An ambulance took R.C. to the hospital. There, he received stitches on his ear and stitches or glue on the back of his head. He had also suffered a chipped tooth, scrapes, and bruises.

Later, after R.C. was able to identify Jones from a photographic line-up, a detective began to stake out Jones's vehicle. Ten days later, the detective spotted Jones and arrested him.

*Defense*

Jones testified in his own defense. On the night of the altercation, Jones was visiting his girlfriend, A.J., at her apartment. At about 10:00 p.m., Jones was playing video games with A.J.'s son when he went down to his car

3

to get his Bluetooth headphones. Jones saw R.C. staring in his girlfriend's window.

A.J. had told Jones that R.C. would look in her windows, and then look away. R.C. waived to A.J.'s daughter when she was in the window, and her daughter waived back. Aware of the problem, Jones had told R.C. about a week earlier, "Stop fucking staring in the window." R.C. stated, "Get the fuck away from me. Don't bother me."

On the night of the incident, Jones told R.C., "Don't fucking stare in the window." Jones was trying to defend his girlfriend. R.C. did not respond or turn to acknowledge Jones. Thinking R.C. did not hear him, Jones went to the back of R.C.'s truck, leaned on it, and said, "Hey, what the fuck are you staring at?" R.C. walked around to the back of the truck and said, "Get the fuck off my truck." Jones realizing he should not be leaning on the truck, moved off of it.

R.C. then went for Jones's throat and choked him, pushed him against the fence, and punched him twice. As R.C. was going for a third punch, Jones grabbed R.C.'s wrist, rolling R.C. down and flipping him. Jones also went down with him. R.C. continued to attack Jones. Jones tried to defend himself, and get R.C. off of him so that he could get away. Jones hit R.C. twice. R.C. grabbed Jones's shirt and tore it. Jones punched R.C. a third time, knocking him to the ground and rendering him unconscious.

Jones walked away because R.C. was no longer a threat. Jones told someone to call 911 because the guy who had just attacked him was unresponsive.

Jones's nose and hand were bleeding profusely. His back was scratched from when R.C. had pushed him against the fence. Jones had cuts to his knuckles. His shoulder was injured from when he fell to the ground when he

4

rolled R.C.'s wrist. Jones went back to the apartment to tend to his wounds. A.J. cleaned Jones's hand.

Jones did not answer the door when the sheriff deputies knocked to speak to him because, as an African-American man in Lakeside, he feared law enforcement. When Jones's brother had been murdered, law enforcement questioned him and a policeman put a gun to his head.

When Jones was arrested, he told law enforcement that R.C. put his hands around Jones's neck first and began punching him. Jones said he had to punch back to protect himself.

A.J. testified she had seen R.C. staring into her apartment window several times, and that he had waved at her child before. On the night in question, Jones was visiting her and playing video games with her son. Jones left the apartment. When he returned, he said a man had choked him, and he had defended himself. Jones had a big gash on his hand (which was bleeding), a big scratch on his shoulder, and scratches on his arm.

## DISCUSSION

### I

### TESTIMONY CONCERNING BOOKING PHOTOGRAPHS

#### A. Jones's Contentions

Jones maintains the trial court erred in denying his motion for a mistrial after Detective Colin Snodgrass testified that he used booking photographs to compile the six-pack photographic lineup containing Jones's photograph. We disagree.

#### B. Background

During the hearing on motions in limine, the prosecutor indicated that he would only seek to impeach Jones with his past crimes if he were to

testify. Jones's counsel objected to any such impeachment. The trial court agreed with defense counsel and ruled that it would exclude evidence of Jones's past criminal behavior.

During trial, on direct examination, the prosecutor asked Snodgrass if he could "describe [the] process of when someone is going to participate in a lineup." Snodgrass responded, "I contacted [R.C.] over the phone, and I came to follow up with his statement. Tentatively identified the suspect in the case. I prepare what's called a six-pack photo lineup using previous booking photos. One of those photos—" The court interrupted Snodgrass, "Let me— just for a second, can I ask counsel for a quick second, please. Excuse the interruption, sir." After an unreported sidebar, the court asked both parties if they would agree to a "joint motion to strike the last statement." Both parties agreed, and the court ordered the jury to "disregard the last statement. Treat it as though you've never heard of it."

During a break in the proceedings, the court and the attorneys discussed what had occurred at the unreported sidebar. As the court explained, it had interrupted the detective after the prosecutor asked about the six-pack photo lineup and "it appeared that [the] detective . . . was starting to allude that he obtained photographs of the six members of the six-pack from prior booking photos." Such a comment "would, of course, raise the specter of [Jones] having a criminal—if not record, at least involvement with law enforcement." For that reason, "the court interrupted as soon as it could and asked for counsel to go sidebar." At the sidebar, defense counsel "did bring a motion for a mistrial at that time because of the prejudicial effect that the jury would figure out that he had—he's had involvement with law enforcement previously."

6

At this break in the proceedings, the court allowed Jones's counsel to argue his mistrial motion. Defense counsel maintained that "once that bell is rung, you cannot unring it." Because the jury had heard "some evidence that booking photos were used in the lineup," defense counsel believed it was "a pretty simple inference to make that if booking photos are used, then Mr. Jones must have had a booking photo." Given counsel believed "it is substantially more prejudicial for Mr. Jones for them to have those thoughts and be thinking about that when they're conducting their deliberations" and because "we can't unring that bell," defense counsel reiterated her request for a mistrial.

In response, the prosecutor maintained that a mistrial was not warranted because "the court stopped the testimony almost immediately." Because the court had admonished the jury, and based on "how quickly it was stopped and the admonition the court gave, the People [felt] that that's sufficient."

The court then explained:

> "And this is a closer call. We had, of course, in limine rulings regarding impeachment factors. The reference was short. It was brief. I did immediately interrupt it. I, upon return, gave an admonition that I do believe this vitiates the prejudice. The court will remain open as well to any further instructions by [defense counsel] [or] requested [by her]. That's always dicey because you draw attention to it then, but I will remain open if you want anything further. I certainly understand the defense point of view on this, but I think we caught it very quickly, and I was able to give an admonition. So the motion is denied at this time."

C. Analysis

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a

7

particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198 (*Collins*).) The defendant bears the burden to show the trial court abused its discretion in denying his motion for a mistrial. (*People v. Maury* (2003) 30 Cal.4th 342, 434–437.) We review a trial court's ruling on a motion for a mistrial under the deferential abuse of discretion standard. (*People v. Schultz* (2020) 10 Cal.5th 623, 673.)

Here, Jones contends Snodgrass's testimony wherein he referred to a booking photograph to create a six-pack photographic lineup suggested to the jury that he had a criminal record. Further, Jones argues this testimony was so unduly prejudicial, it could not be cured by striking the statement and admonishing the jury. In support of his contentions, Jones relies heavily on *People v. Navarrete* (2010) 181 Cal.App.4th 828 (*Navarrete*) and *People v. Allen* (1978) 77 Cal.App.3d 924 (*Allen*).

In *Navarrete*, the defendant was charged with committing a lewd act on a four-year-old. (*Navarrete, supra*, 181 Cal.App.4th at p. 830.) The trial court granted the defense motion to suppress any reference to defendant's confession that was obtained in violation of his *Miranda*[3] rights. (*Navarrete*, at p. 831.) Upset with the court's ruling, one of the detectives "promised he 'was going to show' the court." (*Id.* at p. 832.) During that detective's testimony, he was asked why he had decided against DNA testing on swabs taken from the victim's body. He replied, " 'Well, for several reasons, the first of which it's a court rule that the defendant's statement is inadmissible. So I

---

3       *Miranda v. Arizona* (1966) 384 U.S. 436.

8

can't state the first reason.'" (*Id.* at p. 831.) The trial court struck the testimony and gave a curative instruction to the jury. (*Id.* at pp. 831–832.) The defendant was convicted and appealed. The appellate court reversed the judgment on the grounds the curative instruction was insufficient because the jury could have reasonably inferred from the detective's testimony that the defendant "had confessed or otherwise incriminated himself, rendering DNA evidence unnecessary." (*Id.* at p. 834.) The Court of Appeal found that the detective intentionally referenced the defendant's inadmissible prior statement because he (the detective) intended to prejudice the jury against the defendant, and the detective's "misconduct more likely than not achieved the effect he sought." (*Id.* at pp. 836–837.) The appellate court further found the trial court's curative instructions could not undo the damage inflicted by the detective's testimony because the instruction "did not break the link the jury was likely to perceive between a 'statement' and a 'confession' in the context of other evidence the jury heard." (*Id.* at p. 834.)

*Navarrete* is not instructive here. This case, unlike *Navarrete*, did not involve a confession, which that court and other courts have recognized presents a special difficulty. (See *Navarrete*, *supra*, 181 Cal.App.4th at pp. 834–835 [quoting conc. opns. of Rehnquist, C.J. and Kennedy, J. in *Arizona v. Fulminante* (1991) 499 U.S. 279, 312, 313 stating, respectively, that a confession may be " 'devastating to a defendant' " and " '[i]f the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case' "].) As the court in *Navarrete* stated, "courts accept that jurors cannot be expected to wipe from their minds knowledge that a codefendant has confessed even when a trial court instructs them to do so." (*Navarrete*, at p. 835.) In addition, there is no indication in

9

the record here that Snodgrass intended to prejudice the jury as did the detective in *Navarrete*. In short, *Navarrete*'s severe facts makes it clearly distinguishable from the instant action.

*Allen*, the other case on which Jones relies, also is not helpful to his argument. There, the defendant, charged with robbery, testified (along with his sisters) that he was elsewhere on the night in question. (*Allen*, *supra*, 77 Cal.App.3d at pp. 928–929.) The prosecution witnesses included a minor who was an accomplice and his mother. (*Id.* at p. 929.) The minor's mother testified that one of the defendant's sisters told her the defendant was " 'on parole.' " (*Ibid*.) The trial court immediately struck the parole reference, and the jury was instructed to disregard it. (*Id.* at p. 934.) Following his conviction, the defendant appealed and argued that the trial court committed reversible error by denying his motion for mistrial based on the testimony that he was " 'on parole.' " (*Id.* at p. 930.) The appellate court agreed, stating: "An examination of the record reveals an extremely close case in which the jury had to make its fact determination based upon the credibility of the [defendant] and his witnesses and on the credibility of the prosecution's witnesses." (*Id.* at p. 935.) The court thus found it was reasonably probable the outcome would have been more favorable to the defendant without the prejudicial information of his parole status. (*Ibid*.)

To the extent Jones contends *Allen* stands for the proposition that it is an abuse of discretion—per se—to deny a mistrial in any case where a defendant's previous incarceration or custody status is disclosed to the jury, we disagree. As *People v. Bolden* (2002) 29 Cal.4th 515 demonstrates, a fleeting reference to a defendant's previous incarceration does not compel a trial court to grant a mistrial. In *Bolden*, a police officer testified that the defendant's present address was " 'the Department of Corrections parole

10

office. . . .' " (*Id.* at p. 554.) The trial court denied the defendant's motion for a mistrial and the Supreme Court found no abuse of discretion, reasoning it was "doubtful that any reasonable juror would infer from the fleeting reference to a parole office that defendant had served a prison term for a prior felony conviction" and that the "incident was not significant in the context of the entire guilt trial. . . ." (*Id.* at p. 555.)

Further, we find the instant matter distinguishable from *Allen*. There is a marked difference between a jury knowing a defendant was on parole and knowing a defendant was previously arrested. Parole indicates that the defendant was convicted of a crime serious enough to result in a prison sentence and supervision after the fact. An arrest simply connotes that law enforcement believed it had cause to apprehend a defendant. An arrest does not mean that the defendant was convicted and served a prison sentence. While this distinction might not be apparent to all, a jury empaneled on a criminal case would, at a minimum, understand that an arrest falls short of indicating a defendant was guilty of the charge.[4] Given this difference in degree, the reference to parole in *Allen* was far more damaging to the defendant's credibility than the reference to a booking photo in this case.

Additionally, the evidence in *Allen* clearly linked the defendant to having previously committed a felony. A witness testified that the defendant was on parole. In contrast, here, the evidence was more subtle and there was no direct reference to Jones having committed a previous crime.

Accordingly, we do not find that the court abused its discretion in denying Jones's motion for a mistrial. Snodgrass made a single, fleeting reference to using booking photos to create a six-pack photo lineup. The court

---

[4]     Pursuant to a standard instruction, the jury was told that Jones's arrest was not to be considered as evidence of guilt.

immediately interrupted the witness's testimony and admonished the jury to ignore the testimony. Jones points to no statements by the prosecutor suggesting that the jurors should infer Jones's guilt or a predisposition for criminality based on Snodgrass's statements. Additionally, the jury was instructed before deliberating to "not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial." The jury was also instructed that Jones was presumed to be innocent. And the jury was told that if the court ordered testimony stricken from the record, it must disregard it and not consider that testimony for any purpose. "When, as here, there are no indications to the contrary, we assume that the jurors followed the trial court's instructions" and did not, based solely on hearing that Snodgrass used a booking photo to create a lineup, find Jones guilty without supporting evidence. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1413.) For these reasons, the brief reference to a booking photo did not irreparably damage Jones's chance of receiving a fair trial.

Furthermore, nothing in the record suggests that Snodgrass willfully violated a court order, acted in bad faith, or intended to prejudice the jury. A jury is presumed to have followed an admonition to disregard improper evidence, particularly where there is an absence of bad faith. (*Allen*, *supra*, 77 Cal.App.3d at p. 934.) Indeed, the trial court's denial of Jones's motion was consistent with cases where courts properly denied mistrial motions based on volunteered testimony. (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 428 [court properly denied motion for a mistrial after prosecution witness testified he had taken a polygraph because the testimony was brief and the court admonished the jurors to disregard the testimony].) Given the brevity of Snodgrass's objectionable statement, the striking of his testimony, and the trial court's immediate admonition to the jury, we conclude that the

12

trial court properly exercised its considerable discretion in denying the defense motion for mistrial.

## II

## THE ALLEGED *DOYLE* ERROR

### A.  Jones's Contentions

Jones asserts the prosecutor committed a *Doyle* violation, during the cross-examination of Jones and rebuttal closing argument, by criticizing Jones for remaining silent.  On the record before us, we conclude that Jones forfeited any alleged *Doyle* violation by failing to object below.  In addition, even if we considered the merits of Jones's argument, we would conclude no *Doyle* violation occurred on the record before us.

### B.  Background

During the prosecution's case-in-chief, the prosecutor presented evidence that law enforcement tried to locate Jones after his altercation with R.C.  They followed the blood trail to A.J.'s apartment, and sheriff deputies called to Jones.  No one answered the apartment door.  For the next several days, a detective staked out Jones's vehicle.  Ten days after the incident, the detective saw Jones at his girlfriend's apartment complex and arrested him.

On direct examination, Jones explained why he did not answer A.J.'s door when the deputies were calling his name as well as his distrust of and negative experience with law enforcement.  Further, Jones testified that once he was arrested, he "had a chance to tell [his] story."

During cross-examination, Jones admitted he had known the deputies were trying to contact him the night of the altercation, but he did not "go out that night to give [his] side of the story."  He further testified that he did not call the sheriff's department to explain what had happened.  The prosecutor

13

confirmed with Jones that he had not talked to deputies on the night in question, "even though, from what you're telling us today, you were the one that was attacked first." Jones testified that he did not talk to the deputies or call the sheriff's department because he did not believe he had done anything wrong.

On redirect, Jones explained that trial was not the first time he told his side of the story. Thus, on the day he was arrested, Jones told the detective that he acted in self-defense after R.C. wrapped his hands around his neck and punched him.

During closing argument, the prosecutor contrasted the fact that Jones had fled to his apartment, and had not wanted to meet with law enforcement with "the fact that [R.C.] met with them immediately, [was] very forthcoming, told them his side of the story, [and] let them take pictures." Later, the prosecutor challenged the credibility of Jones's version of events. He detailed how Jones "knew the police were looking for him [but] didn't go out to meet them because . . . he knew he did something he wasn't supposed to do." The prosecutor continued, "That's why he waited until—to give his story days later. He never reached out to law enforcement to provide his side of the story. They had to go find him." The prosecutor emphasized that if Jones "was in the right . . . he would have nothing to fear." He then questioned why, when law enforcement officers "were trying to investigate and trying to contact him," Jones did "not go and speak to them."

During Jones's closing argument, defense counsel argued that Jones "has told the truth from day 1." To this end, counsel emphasized, "He told the truth when he went up to the apartment . . . he told the truth when law enforcement officers contacted him on October 11th and then was arrested. And he told the truth when he took the stand to testify in this trial."

14

During rebuttal closing argument, the prosecutor addressed the defense claim that Jones "was telling the truth since day 1." As the prosecutor pointed out, "Day 1 was the night that this happened." On that day, Jones "wasn't trying to tell the truth because he hadn't concocted some story, figure[d] it out with his girlfriend, and then come in here and [told] it to you." Subsequently, the prosecutor again emphasized that Jones "had all this time where he could have come and told his side of the story. He could have told his side of the story that night when they were looking for him when they were trying to get a story from him."

## C. Analysis

"In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony." (*Collins*, *supra*, 49 Cal.4th at p. 203.)

Jones contends the prosecutor committed a *Doyle* violation by asking why Jones did not call the sheriff's department *before* he was arrested to tell his side of the story and compounded the error by referring to Jones's failure to talk to the deputies when they were looking for him on the night of the incident. The People argue the claim of error was forfeited, and there was no *Doyle* error because the prosecutor only asked about Jones's pre-*Miranda* silence. The People have the better argument.

As Jones concedes in the opening brief, his trial counsel did not object to any of the prosecutor's questions during the cross-examination of Jones or comments during closing argument of which he now complains. Thus, Jones forfeited his claim of *Doyle* error by failing to object on such grounds at trial. (See *Collins*, *supra*, 49 Cal.4th at p. 198 [" ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the

15

same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety" ' "]; *People v. Tate* (2010) 49 Cal.4th 635, 691–692 [forfeiture rule applies to *Doyle* violation claims].)

Even if the claim had been preserved, there was no error. *Doyle* is implicated only after a defendant has been advised of his *Miranda* rights and has expressly invoked his right to remain silent. (*People v. Tom* (2014) 59 Cal.4th 1210, 1236 ["use of a defendant's postarrest, pre-*Miranda* silence is not barred by the Fifth Amendment in the absence of custodial interrogation or a clear invocation of the privilege" against self-incrimination].) The testimony set forth *ante* establishes that Jones did not talk to law enforcement between the night of his altercation with R.C. until he was arrested. After he was arrested, Jones claimed that he had a chance to tell his story.

Nonetheless, Jones construes the prosecutor's comments during rebuttal closing argument that he had "all this time where he could have come in and told his story" as a reference to Jones's silence *after* he was arrested and received his *Miranda* warning. Yet, Jones's argument is belied by the context of the prosecutor's rebuttal closing.

There, the prosecutor was challenging defense counsel's assertion that Jones "ha[d] told the truth from day 1." Thus, the prosecutor pointed out that "day 1 was the night that this happened." On that day, Jones "wasn't trying to tell the truth because he hadn't concocted some story, figure[d] it out with his girlfriend, and then come in here and [told] it to you." The prosecutor then emphasized that Jones was not credible by arguing to the jury that Jones "ha[s] all this time where he could have come and told his side of the story. He could have told his side of the story that night when

16

they were looking for him when they were trying to get a story from him." The prosecutor's comments cannot reasonably be viewed as questioning or bringing attention to Jones's silence *after* he was arrested. Rather, the prosecution was commenting on Jones's failure to talk to law enforcement *before* he was arrested although he had the chance to do so. Jones's reliance on *People v. Eshelman* (1990) 225 Cal.App.3d 1513 is therefore misplaced. (See *id.* at pp. 1520–1521 [prosecutor, during cross-examination and closing argument, challenged defendant's post-*Miranda* refusal to discuss the crime with his girlfriend].) In short, there was no *Doyle* error.

### III

### THE TRAVEL RESTRICTION

#### A. Jones's Contentions

As part of Jones's probation, the trial court imposed a condition whereby he must obtain the probation officer's "consent before leaving San Diego county."[5] Jones maintains this travel restriction violates *Lent, supra*, 15 Cal.3d 481 and is unconstitutionally overbroad. We agree with the People that Jones forfeited any challenge to the condition under *Lent* by failing to object below. Additionally, we disagree that the condition is unconstitutionally overbroad.

#### B. Legal Principles

The trial court has broad discretion to determine the conditions necessary to serve the two primary goals of probation: promoting rehabilitation and protecting the safety of the public. (*People v. Moran* (2016) 1 Cal.5th 398, 402–403 (*Moran*); *People v. Carbajal* (1995) 10 Cal.4th 1114,

---

[5] This condition contains another provision whereby Jones must obtain the probation officer's and court's permission to move out of state. He does not challenge this portion of the condition.

17

1120.)  If the defendant finds these conditions to be too onerous, he or she may forgo probation and accept the alternative sentence.  (*Moran*, at p. 403.)  The court's discretion is not without limits, though; conditions regulating otherwise legal conduct must be reasonably related to past or future criminality and conditions that restrict the exercise of constitutional rights must be narrowly tailored to the purpose of the condition.  (*Lent, supra*, 15 Cal.3d at p. 486; *People v. Olguin* (2008) 45 Cal.4th 375, 384 (*Olguin*).)

We review challenges to the reasonableness of conditions imposed by the sentencing court for an abuse of discretion.  (*Olguin, supra*, 45 Cal.4th at p. 379.)  Under the test set forth in *Lent*, the court does not abuse this discretion in imposing a given probation condition unless the condition " '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.' " (*Lent, supra*, 15 Cal.3d at p. 486.)  We review challenges to probation conditions as constitutionally overbroad de novo.  (*People v. Appleton* (2016) 245 Cal.App.4th 717, 723.)

A defendant who believes a proposed probation condition is unreasonable or overbroad must timely object to the condition in the trial court, thereby giving the parties an opportunity to provide argument or evidence concerning the need for the condition and the court an opportunity to modify the condition if necessary in light of such argument and evidence.  (*People v. Welch* (1993) 5 Cal.4th 228, 234–235 (*Welch*).)  A defendant who fails to do so typically forfeits any such argument on appeal.  (*Ibid*.)  Despite this general rule, a defendant may raise a "facial" constitutional challenge to a probation condition for the first time on appeal if the challenge involves a pure question of law that can be resolved without any reference to the trial

court record. (*Id.* at p. 235; *In re Sheena K.* (2007) 40 Cal.4th 875, 887–889 (*Sheena K.*).) This exception does not apply to reasonableness challenges under *Lent* because *Lent* requires the court to determine whether the condition relates to the defendant's previous criminal activity, thereby requiring the court to review the record with regard to the defendant's previous crimes. (*Welch*, at p. 237.)

C. Analysis

As a threshold matter, we note that Jones has forfeited his contention that the travel restriction is unreasonable under *Lent* because he failed to object below. (See *Welch, supra,* 5 Cal.4th at pp. 234–235.) However, Jones's claim that the condition is unconstitutionally overbroad is properly before us. As the People concede, that argument constitutes a facial challenge to a probation condition involving a pure question of law. (See *Sheena K., supra,* 40 Cal.4th at p. 889.)

A probation condition " 'is unconstitutionally overbroad . . . if it (1) "impinge[s] on constitutional rights," and (2) is not "tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation." [Citations.] The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement.' " (*People v. Arevalo* (2018) 19 Cal.App.5th 652, 656–657.)

"Although not explicitly guaranteed in the United States Constitution, '[t]he right to travel, or right of migration, now is seen as an aspect of personal liberty which, when united with the right to travel, requires "that all citizens be free to travel throughout the length and breadth of our land

19

uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." ' " (*Moran*, *supra*, 1 Cal.5th at p. 405.)

Our high court has explained the legitimate state interest in imposing probation conditions that restrict a person's right to travel. "Imposing a limitation on probationers' movements as a condition of probation is common, as probation officers' awareness of probationers' whereabouts facilitates supervision and rehabilitation and helps ensure probationers are complying with the terms of their conditional release. [Citations.] [¶] Although criminal offenders placed on probation retain their constitutional right to travel, reasonable and incidental restrictions on their movement are permissible." (*Moran*, *supra*, 1 Cal.5th at p. 406.)

Case law has held that when a probation condition does not bar a person's ability to travel altogether but instead requires advance permission from a probation officer, the condition is closely tailored to avoid unconstitutional overbreadth. (See *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1195 ["the condition's limitation on interstate travel is closely tailored to the purpose of monitoring defendant's travel to and from California not by barring his ability to travel altogether but by requiring that he first obtain written permission before doing so"]; *In re Antonio R.* (2000) 78 Cal.App.4th 937, 942 (*Antonio R.*) [a minor's constitutional rights were not "impermissibly burdened" by a probation condition restricting travel to Los Angeles County from Orange County in light of the "safety valve" that allowed such travel with the permission of a probation officer or a parent (italics omitted)]; *People v. Thrash* (1978) 80 Cal.App.3d 898, 902 [rejecting a challenge to a probation condition providing that "the defendant is not to leave town without getting permission from the proper authorities"].)

Here, because the probation condition does not contain an outright ban on travel outside the county, but instead permits such travel at any time with the "safety valve" of probation officer permission (*Antonio R.*, *supra*, 78 Cal.App.4th at p. 942), it is carefully tailored to avoid being impermissibly overbroad. Indeed, some of Jones's arguments against the condition underscore that it passes constitutional muster. For example, he argues that the condition makes it *difficult* for him to attend family gatherings and work events and also curtails outings for basic necessities (like shopping or finding a cheaper repair shop). Yet, although the restriction might make it more complicated to leave the county, it does not limit Jones's right to travel outright. Rather, the condition merely requires him to obtain permission from his probation officer before partaking in any family gatherings, work events, or shopping that occurs outside San Diego County.

Moreover, California law protects Jones from his probation officer unreasonably denying his requests to travel. Our high court has established that probation officers do not have unlimited discretion with respect to such conditions, and instead have an inherent obligation to act reasonably in the supervision of probationers and in applying the associated conditions of their probation. (*Olguin*, *supra*, 45 Cal.4th at pp. 380–382.) A probation department's authority to ensure compliance with terms of probation does not authorize irrational directives by probation officers. (*People v. Kwizera* (2000) 78 Cal.App.4th 1238, 1240–1241.)

Our analysis does not change when we consider *People v. Smith* (2007) 152 Cal.App.4th 1245, as Jones urges us to do. In that case, the defendant was convicted of committing a lewd act on a minor and required to register as a sex offender. The court placed him on probation, with a condition that prohibited him from leaving Los Angeles County for any reason, which was a

standard condition imposed on anyone convicted of an offense that required registration. (*Id*. at p. 1247.) The court concluded that the defendant had "a constitutional right to intrastate travel [citations] which, although not absolute, may be restricted only as reasonably necessary to further a legitimate governmental interest [citation]." (*Id*. at p. 1250.) The court also determined that the absolute travel prohibition was "constitutionally infirm" because it failed to consider defendant's right to work and it did not reasonably relate to his crimes. (*Id*. at pp. 1251–1252.)

In contrast to *Smith*, the court here did not impose an outright travel ban on Jones. He was not prohibited from leaving San Diego County under any circumstances but instead only has to request permission to leave under the express terms of his probation conditions. And there is no reason on this record to believe that permission would be unreasonably withheld. In addition, there is no evidence in the record about how or why Jones might be adversely affected by having to obtain permission from his probation officer before leaving San Diego County.

We therefore conclude the superior court did not err by including the travel restriction in the terms of Jones's probation.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

BUCHANAN, J.

CASTILLO, J.